**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

VICTORIA WAGGONER and
ROBERT WAGGONER,

              Plaintiffs,

vs.                             Case No. 3:09-cv-10367-J-37JBT

R.J. REYNOLDS TOBACCO CO., et al.,[1]

              Defendants.

_____

## <u>ORDER</u>

The <u>Engle</u> tobacco odyssey began in 1994, when a Florida trial court certified a

nationwide smokers' class action lawsuit against the major domestic cigarette companies

and two tobacco industry organizations for injuries allegedly caused by smoking. Nearly five

years ago, the Florida Supreme Court decertified the class and instructed that certain jury

_____

[1] The named defendants in this action are R.J. Reynolds Tobacco Company, individually and as successor by merger to Brown & Williamson Tobacco Corporation and The American Tobacco Company ("RJR"); and Philip Morris U.S.A., Inc. ("Philip Morris"). However, as discussed at the June 6, 2011 <u>Engle</u> Case Management Conference (Doc. 173 in Case No. 3:09-cv-10000-J-32JBT, "<u>Engle</u> Master Docket"), the preclusion and due process issues presented herein impact each of the thousands of <u>Engle</u> progeny cases pending before this Court. As a result, this Court instructed any <u>Engle</u> tobacco defendant, whether or not named as a defendant in this particular action, that wished to be heard on issues herein, or that wished to adopt the position of another defendant on those issues, to file the appropriate pleading in this case. (<u>See</u> <u>Engle</u> Master Docket Doc. 175.) Accordingly, Lorillard Tobacco Co. ("Lorillard"), Liggett Group LLC ("Liggett"), and Vector Group, Ltd. ("Vector") have joined in and adopted the Fed. R. Civ. P. 16(c) Motion to Determine the Preclusive Effect of the <u>Engle</u> Phase I Findings filed by RJR and Philip Morris in this case. (<u>see</u> Doc. 35 at 1 n.1; Doc. 36 at 1). Collectively, these entities are referred to as "Defendants." Following submission of this issue to the undersigned, this action was transferred for trial to my colleague, the Honorable Roy B. Dalton, Jr., with the understanding that the undersigned would still decide this motion.

findings relating to the tobacco defendants' products and conduct would "have *res judicata* effect" in individual damages actions brought by former Engle class members. Since that time, the question of how to properly apply the "Engle findings" in accordance with the Florida Supreme Court's directive—and whether and to what extent giving those findings preclusive effect in Engle progeny cases would violate the tobacco defendants' due process rights—has confronted the state and federal trial courts tasked with resolving thousands of these cases. After a number of twists and turns, that question is before this Court for a second time.

## I.  Background

### A.  The Engle Litigation

The extensive history of the Engle litigation was recently summarized by the Eleventh Circuit:

> Almost two decades ago, six individuals filed a lawsuit in Florida state court against the major domestic makers of cigarettes and two industry organizations seeking over $100 billion in both compensatory and punitive damages for injuries allegedly caused by smoking. Liggett Grp. Inc. v. Engle, 853 So. 2d 434, 440-41 (Fla. 3d DCA 2003)("Engle II"). The plaintiffs asserted claims of "strict liability, negligence, breach of express warranty, breach of implied warranty, fraud, conspiracy to commit fraud, and intentional infliction of emotional distress." Id. at 441. After some wrangling between the parties and an interlocutory appeal to the Third District Court of Appeal, a class was certified composed of "[a]ll Florida citizens and residents," R.J. Reynolds Tobacco Co. v. Engle, 672 So. 2d 39, 42 (Fla. 3d DCA 1996) ("Engle I"), "and their survivors who have suffered, presently suffer or who have died from diseases and medical conditions caused by their addiction to cigarettes that contain nicotine." Engle v. Liggett Grp. Inc., 945 So. 2d 1246, 1256 (Fla.2006) ("Engle III"). There were estimated to be at least 700,000 class members. Id. at 1258; Engle II, 853 So. 2d at 442.
>
> To manage the class action, the trial court developed a trial plan that had three phases. See Engle III, 945 So. 2d at 1256. Phase I was a year-long trial that

involved only "common issues relating ... to the defendants' conduct and the general health effects of smoking." Id. The jury was given a verdict form at the end of Phase I containing a series of questions. The verdict form asked the jury to answer "yes" or "no" to each question for specific time periods for each of the defendants.

The Engle class came close to running the table–the jury answered "yes" to almost every question put to them. The jury found: (1) that smoking cigarettes causes 20 of 23 listed diseases or medical conditions; (2) that cigarettes containing nicotine are addictive or dependence producing; (3) that the defendants placed cigarettes on the market that were defective and unreasonably dangerous; (4) that the defendants made a false statement of a material fact, either knowing the statement was false or misleading, or being without knowledge as to its truth or falsity, with the intention of misleading smokers; (4a) that the defendants concealed or omitted material information, not otherwise known or available, knowing the material was false and misleading, or failed to disclose a material fact concerning or proving the health effects and/or addictive nature of smoking cigarettes; (5) that the defendants entered into an agreement to misrepresent information relating to the health effects of cigarette smoking, or the addictive nature of smoking cigarettes, with the intention that smokers and members of the public rely to their detriment; (5a) that the defendants entered into an agreement to conceal or omit information regarding the health effects of cigarette smoking, or the addictive nature of smoking cigarettes, with the intention that smokers and members of the public rely to their detriment; (6) that the defendants sold or supplied cigarettes that were defective in that they were not reasonably fit for the uses intended; (7) that the defendants sold or supplied cigarettes that, at the time of sale or supply, did not conform to representations of fact made by the defendants either orally or in writing; (8) that the defendants failed to exercise the degree of care that a reasonable cigarette manufacturer would exercise under like circumstances; (9) that the defendants engaged in extreme and outrageous conduct or with reckless disregard relating to cigarettes sold to Florida smokers with the intent to inflict severe emotional distress; and (10) that the defendants' conduct rose to a level that would permit a potential award or entitlement to punitive damages. See id. at 1257 n. 4.

In Phase I, however, the jury was not asked whether the class had proven any of its claims; it did not decide if the defendants were liable to anyone on any cause of action. See Engle III, 945 So. 2d at 1246 ("In Phase I, the jury decided issues related to Tobacco's conduct but did not consider whether any class members relied on Tobacco's misrepresentations or were injured by Tobacco's conduct."); Engle II, 853 So. 2d at 450 ("In Phase [I], the jury answered certain general questions about the defendants' products and conduct. The questions

related to some, but not all of the elements of each legal theory alleged .... The jury did not determine whether defendants were liable to anyone. Essential elements of liability, such as reliance and proximate cause, were [not] tried in Phase I.").

Later, in Phase II, the same jury did determine that the defendants' conduct was the legal cause of three individual class representatives' injuries. The three were awarded a total of $12.7 million in compensatory damages after their comparative fault was taken into account. Engle III, 945 So. 2d at 1257. The jury also awarded a lump sum of $145 billion in punitive damages to the entire Engle class. Id.

Before Phase III[—in which new juries were to decide the individual liability and damages claims for each individual class member—]could be conducted, the defendants appealed the verdicts the jury had returned in Phases I and II. Engle II, 853 So. 2d at 441-42; see also Brown v. R.J. Reynolds Tobacco Co., 576 F. Supp. 2d 1328, 1332 (M.D. Fla. 2008)[("Bernice Brown I")]. The appeal resulted in a Third District Court of Appeal decision that the Engle class should be decertified. The court concluded that class action treatment was inappropriate because "the plaintiffs smokers' claims [we]re uniquely individualized and [could not] satisfy the 'predominance' and 'superiority' requirements imposed by Florida's class action rules." Engle II, 853 So. 2d at 444. The court also reversed the compensatory damages award in favor of the three individual class representatives, finding that none of them had valid claims against any of the defendants. As for the punitive damages award, the court reversed it on a variety of grounds that are not relevant to the present case. See id. at 470.

The class appealed the Third District Court of Appeal's decision to the Florida Supreme Court. That court agreed that the punitive damages award to the class should be reversed, Engle III, 945 So. 2d at 1254, and agreed with the reversal of the compensatory damages award to one of the three individual class representatives, id. at 1276. However, the court reinstated the compensatory damages award to the other two class representatives. Id. For our purposes though, the most important parts of the Engle III decision are those involving certification of the Engle class and the jury's findings in Phase I.

The Florida Supreme Court decided that the trial court had not abused its discretion in certifying the Engle class for Phases I and II but also decided that "continued class action treatment for Phase III of the trial plan [was] not feasible because individualized issues such as legal causation, comparative fault, and damages [would] predominate." Id. at 1267-68. As for the jury's findings in

4

Phase I, the court threw out four of them but determined that the remainder could stand.[2] See Engle III, 945 So. 2d at 1255. (We will refer to the findings that were not thrown out by the Florida Supreme Court as the Phase I "approved" findings.) The court then set out where the case should go from there:

["]The pragmatic solution is to now decertify the class, retaining the jury's Phase I findings other than those on the fraud and intentional infliction of emotion distress claims, which involved highly individualized determinations, and the findings on the entitlement to punitive damages questions, which was premature. Class members can choose to initiate individual damages actions and the Phase I common core findings we approved above will have *res judicata effect* in those trials.["] Id. at 1269 (emphasis added).

Brown v. R.J. Reynolds Tobacco Co., 611 F.3d 1324, 1326-29 (11th Cir. 2010) ("Bernice

Brown II") (footnote in original; other footnotes omitted).[3]

## B.    The **Engle** Progeny Cases and **Bernice Brown**

Former Engle class members who wished to pursue "individual damages actions"

were required to file their claims within one year of the Florida Supreme Court's mandate in

---

[2]    The Florida Supreme Court threw out the jury's findings in response to Question 4, which involved fraud and misrepresentation, and Question 9, which involved intentional infliction of emotional distress. Engle III, 945 So. 2d at 1255. The court explained that the jury's findings in response to those questions were "nonspecific" and were "inadequate to allow a subsequent jury to consider individual questions of reliance and legal cause." Id. The court also threw out the jury's finding in response to Question 5, which involved civil conspiracy-misrepresentation, reasoning that finding could not stand because it "relie[d] on the underlying tort of misrepresentation." See id. Finally, the court threw out as premature the jury's finding in response to Question 10 that the plaintiffs were entitled to punitive damages. See id. at 1269.

[3]    On May 21, 2007, Defendants petitioned the U.S. Supreme Court for a writ of certiorari from Engle III. Notably, one of the questions presented by Defendants' petition was "[w]hether the Due Process Clause prohibits a state court from giving preclusive effect to a jury verdict when it is impossible to discern which of numerous alternative grounds formed the basis for the jury's findings of wrongful conduct." R.J. Reynolds Tobacco Co. v. Engle, 2007 WL 1494692 at *i (2007). On October 1, 2007, the Supreme Court denied the petition without opinion. R.J. Reynolds Tobacco Co. v. Engle, 552 U.S. 941 (2007).

5

Engle III, which left a deadline of January 11, 2008.  Engle III, 945 So. 2d at 1277.  An estimated 9,000 individual suits, which have come to be known as "Engle progeny cases," were brought within the one-year window created by the Florida Supreme Court's savings period.  (See Report of Temporary Special Master on Case Management of Engle Progeny Cases ("TSM Report"), Engle Master Docket Doc. 147, at 18.)  Several thousand such Engle progeny cases were either timely filed in—or removed to—this Court in late 2007 and early 2008.  See Bernice Brown I, 576 F.Supp.2d at 1334.

In their complaints before this Court, the plaintiffs asserted that the Phase I approved findings preclusively established the conduct elements of their Engle progeny claims, meaning they need only prove up "specific causation, apportionment of damages, comparative fault, compensatory damages, and punitive damages" in their individual actions. Bernice Brown II, 611 F.3d at 1329.  The tobacco defendants disagreed, and moved pursuant to Fed. R. Civ. P. 16(c) for a pretrial ruling "to determine the preclusive effects of the Engle Phase I findings and determine whether those findings may be used to establish any of the elements of Plaintiffs' various claims and whether such use may be done in accordance with the dictates of established preclusion law and constitutional due process." Bernice Brown I, 576 F.Supp.2d at 1334.  In an Order dated August 28, 2008, another Judge of this Court determined that under Florida preclusion law "the findings [could] not be given preclusive effect in any proceeding to establish any element of an Engle plaintiff's claim." Id. at 1348.  As "an additional basis for its decision," the Court found that allowing the Phase I approved findings to establish elements of an Engle plaintiff's cause of action would violate the defendants' due process rights.  Id. at 1344-46.  At the parties' request, the Bernice

6

<u>Brown I</u> decision was certified to the Eleventh Circuit for interlocutory appeal. <u>Id.</u> at 1348.[4]

The Eleventh Circuit began its analysis of the <u>Engle</u> preclusion issue by noting that, pursuant to the Full Faith and Credit Act, 28 U.S.C. § 1738, "a federal court must 'give preclusive effect to a state court judgment to the same extent as would courts of the state in which the judgment was entered.'" <u>Bernice Brown II</u>, 611 F.3d at 1331 (quoting <u>Kahn v. Smith Barney Shearson Inc.</u>, 115 F.3d 930, 933 (11th Cir.1997)). In other words, "the Phase I approved findings must be given the same preclusive effect in this federal court case that they would be given if the case were in state court. Florida preclusion law controls." <u>Id.</u> Without the benefit of a Florida appellate court decision directly addressing the preclusive scope of the Phase I approved findings, the Eleventh Circuit canvassed existing Florida preclusion law to determine precisely what "res judicata effect" they would be given in a Florida state court.

As an initial matter, the Eleventh Circuit determined that the Florida Supreme Court's reference to "res judicata" was necessarily a reference to "issue preclusion" rather than "claim preclusion" because "factual issues and not causes of action were decided in Phase

_____

[4]    The Court considered and decided the preclusion issue in <u>Bernice Brown I</u> with the understanding that that decision would impact each federal <u>Engle</u> progeny case. The issue was addressed via Rule 16(c) motion because the parties agreed that "a preliminary ruling on the preclusive effects of the Phase I verdict w[ould] shape the scope of discovery the parties may conduct in order to fairly litigate this matter." <u>Id.</u> at 1335. On October 14, 2008, the parties filed a Joint Motion to Stay requesting that this Court "stay discovery and pretrial proceedings in all pending <u>Engle</u> progeny cases" pending final resolution of interlocutory appeals in <u>Bernice Brown I</u> and <u>Cooper v. R.J. Reynolds Tobacco Co.</u>, 586 F.Supp.2d 1312 (M.D.Fla. 2008). (Case No. 3:07-cv-761-J-25HTS, "<u>Brown</u> Docket," Doc. 59 at 4.) On October 30, 2008, after the Eleventh Circuit granted the interlocutory petition in <u>Bernice Brown I</u>, (<u>Brown</u> Docket, Doc. 62), this Court granted the parties' request for a stay and the stay went into effect. (<u>Brown</u> Docket, Doc. 60.)

I." Id. at 1333.[5]  In Florida, the Court noted, issue preclusion "only operates to prevent the re-litigation of issues that were decided, or 'actually adjudicated,' between the parties in an earlier lawsuit;" that is, the doctrine "prevents 'parties from litigating in the second suit issues–[i.e.] points and questions–common to both causes of action and which were actually adjudicated in the prior litigation.'" Id. at 1334 (quoting Gordon v. Gordon, 59 So. 2d 40, 44 (Fla.1952)).  The Court found that "Florida courts have enforced [this] 'actually adjudicated' requirement with rigor," such that "[i]ssue preclusive effect is not given to issues which could have, but may not have, been decided in an earlier lawsuit between the parties."  Id. (citations omitted).

Applying the "actually adjudicated" requirement to the Engle findings, the Court concluded that "the Phase I approved findings may not be used to establish facts that were not actually decided by the jury." Id.  The Court thus declined to address whether using the

---

[5]  Specifically, the Court stated:

> In Phase I the same parties as in the present lawsuit litigated "common issues" relating to "the defendants' conduct and the general health effects of smoking." Engle III, 945 So.2d at 1256; . . . id. at 1267-68 (explaining that the Engle class must be prospectively decertified because "individualized issues such as legal causation, comparative fault, and damages [would] predominate"). "The idea underlying [claim preclusion] is that if a matter has already been decided, the [litigant] has already had his or her day in court, and for purposes of judicial economy, that matter generally will not be reexamined." *The defendants had their day in court on the "common issues" of fact that were decided in Phase I*, and later approved by the Florida Supreme Court, but they *did not have their day in court on the broader questions involving the causes of action the class asserted, which were left undecided.* See Engle III, 945 So.2d at 1263.

Bernice Brown II, 611 F.3d 1333 (some citations omitted; emphasis added).

approved findings to establish facts which may not have been "actually decided" would violate Defendants' due process rights "because under Florida law the findings could not be used for that purpose anyway." Id. "The bottom line," the Court concluded, "is that the Phase I approved findings may be given effect to the full extent of, but no farther than, what the jury found. The disagreement is about what the jury actually did find." Id.

To determine "what the jury found," the Eleventh Circuit interpreted Florida law to require "the asserting party to show with a *'reasonable degree of certainty'* that the specific factual issue was determined in its favor." Id. at 1335 (quoting Seaboard Coast Line R.R. Co. v. Indus. Contracting Co., 260 So. 2d 860, 864-65 (Fla. 4th DCA 1972) (emphasis added). The Court explained that an Engle progeny plaintiff could utilize "[t]he entire record" to meet this burden, "point[ing] to specific parts of [the record] to support its position, so long as those parts of the record combine to show to a reasonable degree of certainty that the jury made the specific factual determination that is being asserted." Id.[6] In closing, the Court noted:

> In the pre-trial order that is the subject of this interlocutory appeal, the district
> court decided that the Phase I approved findings may not be used to establish

---

[6]    The Court was openly skeptical that plaintiffs could comply with its directive. See id. at 1337 n.1 (Anderson, J., concurring specially) ("The generality of the Phase I findings present plaintiffs with a considerable task. . . ."); see also id. at 1336 n.11 (majority opinion) (incorporating by reference Judge Anderson's concurring opinion). However, the Court left open the question of whether the Phase I approved findings "can be combined with facts that can be proved through other means" to establish elements of an Engle progeny plaintiff's claims. See id. at 1335 n.10; see also id. at 1337 (Anderson, J., concurring specially) ("[I]t would be premature at this stage of the litigation to conclude that later in this litigation plaintiffs will be unable to use some Phase I findings to contribute to or establish some particular element of a plaintiff's cause of action, perhaps in conjunction with other facts proved in this litigation").

any element of the plaintiffs' causes of action. The district court reached that conclusion without first giving preclusive effect to the Phase I approved findings. *The Phase I approved findings have to be given preclusive effect; they do establish some facts that are relevant to this litigation. Otherwise, the Florida Supreme Court's statement in Engle III that the Phase I approved findings were to have "res judicata effect" in trials involving former class members would be meaningless.* It is for the district court to determine, for example, whether the jury's answer to Question 3 [i.e., that the defendants placed cigarettes on the market that were defective and unreasonably dangerous] establishes only that the defendants sold some cigarettes that were defective and unreasonably dangerous, *or whether the plaintiffs have carried their burden of showing to a reasonable degree of certainty that it also establishes that all of the cigarettes that the defendants sold fit that description.* See Seaboard, 260 So. 2d at 864-65.

Until the scope of the factual issues decided in the Phase I approved findings is determined, it is premature to address whether those findings by themselves establish any elements of the plaintiffs' claims. Only after Florida law is properly applied to determine the scope of the facts established by the approved findings can it be decided which, if any, elements of the claims are established by them. Accordingly, the district court's ruling that "the findings may not be given preclusive effect in any proceeding to establish any element of an Engle Plaintiff's claim," cannot stand, at least not at this time.

Id. at 1335-36 (emphasis added). The Eleventh Circuit thus vacated and remanded, leaving it to this Court "to apply Florida law as we have outlined it and decide in the first instance precisely what facts are established when preclusive effect is given to the approved findings." Id. at 1336.

After the Eleventh Circuit issued its mandate in August 2010, the parties filed various motions proposing that this Court's stay be lifted in a number of select Engle progeny cases, which would then proceed to discovery and trial. (See Engle Master Docket, Docs. 5, 6, 8, 9). Following a December 7, 2010 case management conference (Engle Master Docket, Doc. 30), the Court entered its First Omnibus Engle Order (Engle Master Docket, Doc. 42,

"First Omnibus <u>Engle</u> Order"), lifting the stay in twelve "lead" cases only.[7] With respect to the preclusion issue on remand from <u>Bernice Brown II</u>, the parties were directed to file motions and memoranda in each activated case so that this Court could determine which <u>Engle</u> facts should be given preclusive effect under Florida law as the Eleventh Circuit had outlined it. (First Omnibus <u>Engle</u> Order at 2.)

### C.   <u>Martin</u>

Before the Court could undertake that task, however, the landscape of Florida preclusion law—specifically as it pertains to <u>Engle</u>—changed. On December 14, 2010, the First District Court of Appeal became the first Florida appellate court to address "the extent to which an <u>Engle</u> class member can rely upon the findings from the class action when she individually pursues one or more <u>Engle</u> defendants for damages." <u>R. J. Reynolds Tobacco Co. v. Martin</u>, 53 So. 3d 1060, 1066 (Fla. 1st DCA 2010).[8] In <u>Martin</u>, a cigarette smoker's widow sued RJR seeking damages for her husband's death, alleging causes of action for strict liability, fraud by concealment, conspiracy to commit fraud, negligence, and punitive damages. <u>Id.</u> at 1064. After a jury trial, the trial judge instructed the jury, in pertinent part:

> This action has been brought as a part of a case known as the <u>Engle</u> class action. The first issue for your determination . . . is whether Benny Martin was a member of the <u>Engle</u> class. Certain findings from that action are binding upon you, the Court and the parties. The findings may not be denied or questioned, and they must carry the same weight they would have if you had determined

---

[7]   The Waggoners' case is one of the twelve cases activated by the First Omnibus <u>Engle</u> Order. (<u>See</u> First Omnibus <u>Engle</u> Order at 1 n.1.)

[8]   The <u>Martin</u> court noted: "This is the first so-called '<u>Engle</u> progeny' case to reach a district court of appeal following the Florida Supreme Court's decision in [<u>Engle III</u>]." <u>Id.</u> at 1062.

them yourselves.  The established findings are: Finding one, is that cigarettes are addictive.  Finding two, is that cigarettes cause lung cancer.

*If you find that Benny Martin is a member of the* Engle *class, certain other findings are binding upon you, the Court and the parties.*  The findings may not be denied or questioned, and they must carry the same weight they would have if you had determined them yourselves. Those established findings are: Finding three, is that R.J. Reynolds Tobacco Company *was negligent.*  Finding four, is that R.J. Reynolds Tobacco Company *placed cigarettes on the market that were defective and unreasonably dangerous.*  Finding five, is that R.J. Reynolds Tobacco Company *conspired with other companies to conceal or omit information* regarding the health effect [sic] of cigarettes or their addictive nature or both.  Those companies include Phillip Morris, Liggett, Lorillard, Brown & Williamson Tobacco Corporation, individually, and as successors to the American Tobacco Company, the Council for Tobacco Research, USA, Inc., and the Tobacco Institute.  Finding six, is that R.J. Reynolds Tobacco Company, in furtherance of that conspiracy, *concealed or omitted material information*, not otherwise known or available, knowing that material was false or misleading, or failed to disclose a material fact concerning the health effects or addictive nature of smoking cigarettes or both.

\* \* \*

The findings that I have described to you do not establish that R.J. Reynolds Tobacco Company is liable to Mrs. Martin, nor do they establish whether Benny Martin was injured by R.J. Reynolds Tobacco Company's conduct or the degree, if any, to which R.J. Reynolds Tobacco Company's product was the sole or contributing cause of Benny Martin's death. The findings establish only what they expressly state, and you must not speculate or guess as to the basis for the findings.

Id. at 1064-65 (emphasis added).  The jury ultimately found that addiction to RJR cigarettes was a legal cause of Mr. Martin's death; RJR's conspiracy to conceal and actual concealment of information was a legal cause of Mr. Martin's death; RJR and Mr. Martin were respectively 66% and 34% responsible for Mr. Martin's death; and punitive damages were warranted. The jury awarded Mrs. Martin $5 million in compensatory damages, which the court later reduced to $3.3 million based on the jury's apportionment of fault, and $25

12

million in punitive damages.  Id. at 1066.

On appeal, RJR contended that the trial court, by instructing the jury that Mrs. Martin need not present evidence as to RJR's conduct because those facts had been conclusively established in Phase I, had given the Phase I findings an overly broad preclusive effect:

> In RJR's view, the findings given res judicata effect by the supreme court facially prove only that RJR *at some point* manufactured and sold an *unspecified* brand of cigarette containing an *undefined* defect; RJR committed one or more *unspecified* negligent acts; RJR on some occasion concealed *unspecified* information about the health effects of smoking and the addictive nature of smoking; and RJR and several other entities agreed to conceal said unspecified information.  Thus, RJR argues, notwithstanding the Engle findings Mrs. Martin was required to prove Lucky Strike brand cigarettes contained a *specific* defect rendering the brand unreasonably dangerous; RJR violated a duty of care it owed to Mr. Martin; RJR concealed particular information which, had it been disclosed, would have led Mr. Martin to avoid contracting lung cancer; and RJR was part of a conspiracy to conceal the specified information.

Id. (emphasis added).

The Martin court disagreed with RJR's characterization, which it termed "an application of the supreme court's decision that would essentially nullify it."  Id.  Rather, the court found, "[n]o matter the wording of the findings on the Phase I verdict form, the jury *considered and determined specific matters related to the defendants' conduct*.  Because the findings are common to all class members, Mrs. Martin, under the supreme court's holding in Engle[ III], was entitled to rely on them in her damages action against RJR."  Id. at 1067 (emphasis added).  However, as the Martin court acknowledged, this conclusion merely begged the question: "to what extent could Mrs. Martin use the Engle findings to *establish the elements of her claims*?"  Id. (emphasis added).

In answering this question, the court considered the Eleventh Circuit's decision in

13

Bernice Brown II. Though it "generally agree[d]" with the Eleventh Circuit's analysis of Florida preclusion law, the Martin court found it "unnecessary to distinguish between [claim or issue preclusion] or to define what the supreme court meant by 'res judicata' to conclude the factual determinations made by the Phase I jury cannot be relitigated by RJR and the other Engle defendants." Id. Most critically, the court disagreed with the Eleventh Circuit's conclusion that "every Engle plaintiff must trot out the class action trial transcript to prove applicability of the Phase I findings." Id. Rather, the court held, "the common issues" decided by the Phase I jury, "which the jury decided *in favor of the class*, were the 'conduct' elements of the claims asserted by the class, and not simply, as characterized by the Eleventh Circuit, a collection of facts relevant to those elements." Id. (emphasis in original).

The Martin court found support for its holding in the Final Judgment and Amended Omnibus Order entered by the Phase I trial judge, Engle v. RJ Reynolds Tobacco Co., No. 94–08273, 2000 WL 33534572 (Fla.Cir.Ct. Nov. 6, 2000). That Order, the Martin court found, "sets out the evidentiary foundation for the Phase I jury's findings on [Mrs. Martin's] claims, and demonstrates that the verdict is conclusive as to the conduct elements of the claims." Martin, 53 So. 3d at 1068. The First DCA thus concluded—"unlike the Eleventh Circuit"—that "the Phase I findings establish the conduct elements of the asserted claims, and individual Engle plaintiffs need not independently prove up those elements or demonstrate the relevance of the findings to their lawsuits, assuming they assert the same claims raised in the class action." Id. at 1069.[9]

_____

[9]   RJR petitioned the Florida Supreme Court for review of Martin, contending that the First DCA's decision conflicted with existing Florida preclusion law.  On July 19, 2011, the

14

**D.    Post-<u>Martin</u> <u>Engle</u> Progeny Case Management**

Following the First DCA's decision, this Court granted the Defendants' unopposed request to file briefs addressing the impact of <u>Martin</u> on the <u>Engle</u> preclusion issue.  (<u>Engle</u> Master Docket, Doc. 38.)  In their initial brief, Defendants conceded that "the state appellate court opinion in <u>Martin</u> binds this Court on questions of state preclusion law."  (<u>Engle</u> Master Docket, Doc. 44 at 1.)  However, they disagreed with <u>Martin</u>'s holding "as a substantive matter," and argued that "<u>Martin</u> does not (and cannot) conclusively answer whether the Fourteenth Amendment Due Process Clause permits . . . plaintiffs [to use] the <u>Engle</u> findings to establish elements of their claims [without first showing] that those precise issues were actually and necessarily determined in their favor by the <u>Engle</u> jury."  (<u>Id.</u> at 1-2.)

Plaintiffs, in contrast, contended that <u>Martin</u> "answer[ed] the issues raised by the Eleventh Circuit in [<u>Bernice Brown II</u>] concerning the evidentiary basis for the preclusive findings."  (<u>Engle</u> Master Docket, Doc. 45 at 2.)  Specifically, plaintiffs noted that "[t]he <u>Brown</u> court stated issue preclusion under Florida law requires a showing that within reasonable certainty the <u>Engle</u> [Phase] I jury actually adjudicated the factual finding sought to be precluded," and argued that the <u>Martin</u> court had in fact found the Phase I approved findings "were grounded in the evidence and actually adjudicated."  (<u>Id.</u> at 2, 5.)  <u>Martin</u> thus "puts to bed any due process arguments," according to plaintiffs, because "the determination that the findings had been 'actually adjudicated' is tantamount to determining that a full and fair opportunity to litigate existed and that the minimum requirements of due process have been

_____

Florida Supreme Court declined to accept jurisdiction and denied the petition for review.  <u>R.J. Reynolds Tobacco Co. v. Martin</u>, 67 So. 3d 1050 (Fla. 2011).

satisfied." (Id. at 5-6.)

On June 6, 2011, this Court held a Case Management Conference to discuss all matters related to the federal Engle progeny cases, including the preclusion issue. (Engle Master Docket, Doc. 173.) Defendants once again acknowledged that Martin's interpretation of Florida preclusion law controls, "unless this Court were to determine that following Martin would violate the Defendants' federal due process rights." (Engle Master Docket, Doc. 171 at 63.) The due process problem could be avoided altogether, Defendants contended for the first time, if the Court applied Florida preclusion law as outlined by the Eleventh Circuit in Bernice Brown II, an approach which Defendants now believed would comport with due process. (Id. at 66-67.)[10]

Plaintiffs reiterated their position that Martin satisfies the record-based inquiry envisioned by the Eleventh Circuit in Bernice Brown II. (Id. at 67.) Notwithstanding that position, plaintiffs' counsel represented that plaintiffs *could* independently comply with the requirements of the Eleventh Circuit's analysis in Bernice Brown II if required to do so. (Id.) Such compliance would be structured as an offer of proof—a "Brown Proffer"—wherein

_____

[10]    As the Court noted at the hearing, this position marked a subtle shift in Defendants' due process argument. In Bernice Brown I, Defendants had contended that the Phase I jury findings regarding Defendants' wrongful conduct were too general to have any "res judicata effect" whatsoever, because there was "simply no way to know what specific conduct formed the basis of the findings." (Brown Docket, Doc. 34 at 24). At the June 6 hearing, Defendants back-tracked somewhat, agreeing that plaintiffs' satisfaction of a record-based showing as outlined by the Eleventh Circuit in Bernice Brown II would allow for issue preclusive application of specific conduct findings, and that such an application would be consistent with due process; in other words, that Bernice Brown II *equals* due process. Thus, in contrast to their previous position, Defendants now concede at least the possibility that plaintiffs could preclusively establish conduct directly from the Phase I record in a way that is consistent with their due process rights. (See Engle Master Docket, Doc. 171 at 66-67).

16

plaintiffs would identify the issues in a progeny case for which preclusion is sought, supported by specific citations to the <u>Engle</u> record. (<u>See</u> TSM Report at 59-60.) Plaintiffs' "belt and suspenders" approach of complying with <u>Bernice Brown II</u> even though such a showing is not required by Florida preclusion law post-<u>Martin</u> would be in the plaintiffs' best interest, counsel argued, because such compliance would eliminate any due process concerns lingering from <u>Martin</u>'s application of <u>Engle</u>. (<u>Engle</u> Master Docket, Doc. 171 at 67.)

The Court agreed to set the preclusion and due process issues for briefing and a hearing. (<u>Id.</u> at 64, 74.) Accordingly, Defendants filed their Motion To Determine the Preclusive Effect of the <u>Engle</u> Phase I Findings Under Rule 16(c), (Doc. 35), which is the matter presently before the Court. Plaintiffs filed their response in opposition, (Doc. 44), as well as a <u>Brown</u> Proffer purporting to provide <u>Engle</u> record evidence that the Phase I jury decided facts establishing the conduct elements of the Waggoners' claims for strict liability, fraudulent concealment, conspiracy to fraudulently conceal, and negligence. (Doc. 45.)[11] Defendants subsequently filed a reply (Doc. 55), and in a hearing on September 7, 2011, (Doc. 61), the record of which is incorporated herein by reference, the Court heard argument

_____

[11] The Waggoners' Second Amended Complaint (Doc. 21), alleges eight counts: strict liability (Count I); breach of express warranty (Count II); breach of implied warranty (Count III); civil conspiracy to fraudulently conceal (Count IV); fraudulent concealment (Count V); negligence/gross negligence (Count VI); loss of consortium re: Mr. Waggoner (Count VII); and punitive damages (Count VIII). Each count contains an allegation that the <u>Engle</u> Phase I findings "conclusively establish" that the Defendant engaged in the wrongful conduct applicable to that count. (<u>See</u>, <u>e.g.</u>, <u>id.</u> ¶ 17) ("With respect to smoking and health and the manufacture, marketing and sale of their cigarettes, the Engle Phase I findings conclusively establish that the cigarettes sold and placed on the market by Defendants were defective and unreasonably dangerous.")

from the parties and took the matter under advisement.

### E.   Jimmie Lee Brown

On September 21, 2011, two weeks after this Court heard argument on Defendants' Rule 16(c) motion, the Fourth District Court of Appeal became the second Florida appellate court to address the Engle preclusion issue.  See R.J. Reynolds Tobacco Co. v. Jimmie Lee Brown, 70 So. 3d 707, 709 (Fla. 4th DCA 2011).[12]  In Jimmie Lee Brown, as in Martin, a cigarette smoker's widow sued RJR seeking damages for her husband's death, alleging causes of action for strict liability, negligence, fraud by concealment, and civil conspiracy to commit fraud by concealment.  Id. at 711.  The case proceeded to trial in two phases.  In the first phase, "the jury was asked to determine whether Mr. Brown was a member of the Engle class, i.e. whether he was addicted to RJR cigarettes containing nicotine; and, if so, was his addiction a legal cause of his death."  Id.  In the second phase, "the jury was to determine (i) whether RJR's conduct was a legal cause of Mr. Brown's death; (ii) comparative fault; and (iii) damages."  Id. at 713.[13]

In the first phase, the jury answered both class membership questions (i.e., addiction and causation) in Mr. Brown's favor.  Id.  Before the second phase opening statements

---

[12]   As with Martin, the "primary issue on appeal" in Jimmie Lee Brown was "how the Engle [Phase I] jury findings should be applied in individual cases."  Id.

[13]   This bifurcated causation inquiry differed from the trial court's instructions in Martin, which appeared to conflate the question of Engle class membership and legal causation. As noted by the Fourth DCA in Jimmie Lee Brown: "We read Martin to approve the use of the class membership instruction for the dual purpose of satisfying the element of legal causation with respect to addiction and legal causation on the underlying strict liability and negligence claims."  Id. at 714.

18

began, the trial court instructed the jury that because it had found Mr. Brown to be an <u>Engle</u> class member, it was bound by the following findings: "One, R.J. Reynolds Tobacco Company failed to exercise the degree of care which a reasonable cigarette manufacturer would exercise under like circumstances. Two, R.J. Reynolds Tobacco Company placed cigarettes on the market that were defective and unreasonably dangerous." <u>Id.</u> Later, at the close of the second phase evidence,[14] the trial court instructed the jury as follows:

> As I instructed you previously, a prior court decided certain issues and made certain findings that are binding on you and the parties in this case. Therefore, I am now instructing you that *R.J. Reynolds Tobacco Company did the following*: One, failed to exercise the degree of care that a reasonably careful cigarette manufacturer would exercise under like circumstances and placed cigarettes on the market that were defective, and unreasonably dangerous. There are two claims that have been presented to you in this case. The first is one of negligence. The issue for your determination on plaintiff's negligence claim, is whether the failure to exercise reasonable care on the part of R.J. Reynolds Tobacco Company was a legal cause of Roger Brown's death. . . . Negligence is a legal cause of loss, injury or damage if it directly and in natural and continuous sequence produces or contributes substantially to producing such loss, injury or damage so that it can reasonably be said that but for the negligence the loss, injury or damage would not have occurred. In order to be regarded as a legal cause of loss, injury or damage, negligence need not be the only cause. Negligence may be a legal cause of loss even though it operates in combination with some other cause, if the other cause occurs at the same time as the negligence and if the negligence contributes substantially to producing the loss. The second claim, the issue for your determination on the plaintiff's strict liability claim is whether the defective and unreasonably dangerous cigarettes R.J. Reynolds Tobacco Company placed on the market were a legal cause of Roger Brown's death. . . . A defect in a product is a legal cause of loss, injury or damage if it directly and in natural continuous sequence produces or contributes substantially to producing such loss, injury or damage so that it can reasonably be said that but for the defect the loss, injury or damage would not have occurred. In order to be regarded again as a legal cause of loss, a defect need not be the only cause, a defect may be a legal cause of loss even though it operates in combination with some other cause if

---

[14] The Fourth DCA did not describe what evidence was presented in the second phase.

the other cause occurs at the same time as the defect and if the defect contributes substantially to producing such loss.

Id. (emphasis added).  The jury ultimately found both RJR's negligence and its defective and unreasonably dangerous cigarettes to be legal causes of Mr. Brown's death, and awarded Mrs. Brown compensatory damages.  Id. at 713-14.

On appeal, RJR argued—as it had in Martin—that "the trial court gave the Engle findings overly broad preclusive effect, relieving the plaintiff of her burden to prove that RJR committed particular negligent acts in violation of a duty of care owed to Mr. Brown and to prove that the cigarettes Mr. Brown smoked contained a specific defect that injured Mr. Brown." Id. at 714.  After summarizing the conflicting preclusion analyses in Bernice Brown II and Martin, the Fourth DCA sided with Martin on the ultimate question of Engle's preclusive effect:

> By and large, we agree with the Eleventh Circuit's determination in Brown that the Florida Supreme Court's reference to the res judicata effect of the Engle findings necessarily meant issue preclusion, not claim preclusion.  However, we do not go as far as Brown to require trial courts to evaluate whether *any* elements of post-Engle plaintiffs' claims are established by the Engle findings.  We are constrained by the Florida Supreme Court's decision in Engle III, *which held the conduct elements of certain claims were established*. In Phase I of Engle, "common issues" relating to "the defendants' conduct and the general health effects of smoking" were litigated, not the entire causes of action.  Engle III, 945 So.2d at 1256; see also Rice–Lamar v. City of Fort Lauderdale, 853 So. 2d 1125, 1131 (Fla. 4th DCA 2003) (stating that issue preclusion "does not require prior litigation of an entire claim, only a particular issue").  Therefore, we conclude, as Martin did, that *individual post-Engle plaintiffs need not prove the conduct elements in negligence and strict liability claims, as asserted here*. Martin, 53 So.3d at 1069. . . .
>
> Like Martin, and in accordance with Engle III, *the Engle findings preclusively establish the conduct elements of the strict liability and negligence claims as pled in this case.  Those elements are not subject to relitigation*. Nevertheless, the remaining elements of the underlying claims, i.e. legal causation and

20

damages, must be proven in the second phase of trial . . . .

Id. at 715 (emphasis added). Once the court's analysis of the preclusion issue was

complete, however, it appended the following proviso:

> As discussed in more detail in the special concurrence, *we are concerned the*
> *preclusive effect of the Engle findings violates Tobacco's due process rights, but*
> *remain compelled to follow the mandate of the supreme court.* See Richards
> v. Jefferson County, 517 U.S. 793, 797, 116 S.Ct. 1761, 135 L.Ed.2d 76 (1996)
> ("We have long held . . . that extreme applications of the doctrine of res judicata
> may be inconsistent with a federal right that is 'fundamental in character.'")
> (quoting Postal Tel. Cable Co. v. City of Newport, 247 U.S. 464, 476, 38 S.Ct.
> 566, 62 L.Ed. 1215 (1918)).

Id. at 716 (emphasis added).[15] Chief Judge May's special concurrence then chronicled the

legal uncertainty and due process concerns that have arisen in Engle III's wake. In

particular, the concurrence cited Justice Wells' dissent in Engle III (which called the retention

of the Phase I findings "problematic" rather than "pragmatic," Engle III, 945 So. 2d at 1284

(Wells, J., dissenting)) as foreshadowing, and Martin and Bernice Brown I & II as embodying,

Engle's troubling implications for trial and appellate courts. Id. at 718-20 (May, C.J.,

specially concurring). The concurrence then concluded with the following flourish:

> What the trial courts are playing is a form of legal poker. They must use the
> legal cards they have been dealt—the Engle factual findings are binding. But,
> as R.J. Reynolds argues, a number of ultimate factual issues remain unresolved
> as identified by the dissent in Engle and the Eleventh Circuit in Brown.
>
> *And, a lurking constitutional issue hovers over the poker game: To what extent*
> *does the preclusive effect of the Engle findings violate the manufacturer's due*
> *process rights?*

---

[15] It is unclear in the first instance whether it was uncertainty regarding the legal
causation issue, see supra n.13, or the preclusive effect of the Engle findings more
generally, which prompted the Fourth DCA to express its concerns about Defendants' due
process rights.

> Until our supreme court answers these and other questions, parties to the tobacco litigation will continue to play legal poker, placing their bets on questions left unresolved by <u>Engle</u> and calling the bluff of trial courts on a myriad of issues sure to rise from the hundreds, no thousands, of cases pending in trial courts throughout our State.

<u>Id.</u> at 720 (emphasis added).[16]

For the sake of completeness, this Court instructed the parties to file supplemental briefs addressing the effect, if any, of <u>Jimmie Lee Brown</u> on the due process arguments raised by Defendants' Rule 16(c) motion. (Doc. 67.) The parties have now done so (Docs. 78, 80), and this matter is ripe for resolution.[17]

## II. Discussion

The preclusive use of the Phase I approved findings permeates all aspects of the <u>Engle</u> progeny litigation, from discovery to trial.[18] Nearly five years removed from <u>Engle III</u>, courts continue to struggle with the extent to which those findings should be given "res

---

[16] Seizing on the tenor of Chief Judge May's special concurrence and its plea for answers, Defendants requested that the Fourth DCA certify to the Florida Supreme Court the questions (i) whether <u>Bernice Brown II</u>, <u>Martin</u>, or <u>Jimmie Lee Brown</u> gives the correct effect to the <u>Engle</u> findings as a matter of Florida law, and (ii) whether that effect is consistent with federal due process. (<u>See</u> Doc. 78-1 at 3.) On October 21, 2011, the Fourth DCA denied Defendants' request for certification without comment. Thus, as of the date of this opinion, none of the questions raised by Defendants' Rule 16(c) motion are currently before the Florida Supreme Court, nor do they promise to be anytime soon. <u>See</u> <u>supra</u> n.9.

[17] It seems likely that the Florida Supreme Court will have to eventually revisit the issue of what effect should be given to the Phase I approved findings, and this Court wishes it had the luxury of waiting for that to happen. But with thousands of cases pending here (with the first cases set for trial in February 2012) and no case before the Florida Supreme Court that raises this issue, the Court feels that it cannot wait.

[18] <u>See</u> TSM Report at 46 ("By a wide margin, the preclusive use of [the] <u>Engle</u> findings . . . dominate[s] trial issues.")

judicata effect" in the "individual damages actions" brought by former <u>Engle</u> class members, as the Florida Supreme Court requires.  Intertwined with the practical difficulties of affording the Florida Supreme Court's intended preclusive effect to the Phase I approved findings is the "lurking constitutional issue" whether doing so violates Defendants' due process rights. Reaching that ultimate issue, however, requires this Court to untangle the complicated web of <u>Engle III</u>, <u>Bernice Brown II</u>, <u>Martin</u>, and <u>Jimmie Lee Brown</u>.

### A.    <u>Erie</u> and Full Faith and Credit

As the Eleventh Circuit recognized in <u>Bernice Brown II</u>, "the Phase I approved findings must be given the *same preclusive effect in this federal court case that they would be given if the case were in state court*.  Florida preclusion law controls." <u>Bernice Brown II</u>, 611 F.3d at 1331 (emphasis added).  This application of Florida preclusion law to the federal <u>Engle</u> progeny cases is compelled by—and accomplished through—the operation of two independent doctrines: full faith and credit and <u>Erie</u>.  The Full Faith and Credit Act, 28 U.S.C. § 1738, requires that a federal court "give preclusive effect to a state court judgment to the same extent as would courts of the state in which the judgment was entered."  <u>Bernice Brown II</u>, 611 F.3d at 1331 (quotation omitted).  However, identifying the appropriate state rules to determine the preclusive scope of the <u>Engle</u> judgment requires application of <u>Erie</u> principles.  <u>See</u> <u>Erie R.R. Co. v. Tompkins</u>, 304 U.S. 64, 78 (1938).  Thus, while this federal court must, pursuant to the Florida Supreme Court's direction, give "res judicata effect" to the Phase I approved findings as a matter of full faith and credit, <u>Erie</u> provides the vehicle for determining what "res judicata effect" actually means under Florida law.

Under normal circumstances, the decision of the Florida Supreme Court in <u>Engle</u>

23

III—which purported to mandate how the findings should be used—would have been the starting and stopping point for this analysis. See Molinos Valle Del Cibao, C. por A. v. Lama, 633 F.3d 1330, 1348 (11th Cir. 2011) ("Where the highest court—in this case, the Florida Supreme Court—has spoken on the topic, we follow its rule.") However, the sui generis nature of the Engle case, coupled with the Florida Supreme Court's imprecise "res judicata" terminology, left the exact scope of Phase I's preclusive effect unclear. Cf. id. ("Where [the state's highest] court has not spoken, however, we must predict how [that] court would decide this case.") It was for this reason that both another Judge of this Court and the Eleventh Circuit, in Bernice Brown I & II, undertook analyses of Florida preclusion law to predict how and to what extent Florida courts would apply the findings under the directive of Engle III. Ultimately, the Eleventh Circuit concluded—under Florida preclusion law as it existed at the time—that Engle progeny plaintiffs could only use the Phase I approved findings to establish elements of their claims in federal court if they could demonstrate with a "reasonable degree of certainty" that the "*specific factual issue*" in question was actually and necessarily determined by the jury. Bernice Brown II, 611 F.3d at 1334-35 (emphasis added).

As detailed supra, shortly after the Eleventh Circuit issued its mandate, two Florida intermediate appellate courts determined that the Phase I approved findings are preclusive as to the conduct elements of an Engle progeny plaintiff's claims. See Martin, 53 So.3d at 1069 ("[U]nlike the Eleventh Circuit, we conclude the Phase I findings establish the conduct elements of the asserted claims, and individual Engle plaintiffs need not independently prove up those elements or demonstrate the relevance of the findings to their lawsuits, assuming

24

they assert the same claims raised in the class action"); Jimmie Lee Brown, 70 So. 3d at 715 ("We are constrained by the Florida Supreme Court's decision in Engle III, which held the conduct elements of certain claims were established. . . . Like Martin, and in accordance with Engle III, the Engle findings preclusively establish the conduct elements of the strict liability and negligence claims as pled in this case. Those elements are not subject to relitigation"). Further, both courts expressly disagreed with Bernice Brown II by holding that an Engle progeny plaintiff need not demonstrate, with reference to the Engle record or otherwise, that specific determinative facts underpinning the conduct elements of their claims were "actually adjudicated" by the Phase I jury. See Martin, 53 So.3d at 1067 ("[W]e do not agree every Engle progeny plaintiff must trot out the class action trial transcript to prove applicability of the Phase I findings. . . . The common issues, which the jury decided *in favor of the class*, were the 'conduct' elements of the claims asserted by the class, and not simply, as characterized by the Eleventh Circuit, a collection of facts *relevant* to those elements") (emphasis in original); Jimmie Lee Brown, 70 So. 3d at 715 ("[W]e do not go as far as [the Eleventh Circuit in] Brown to require trial courts to evaluate whether any elements of post-Engle plaintiffs' claims are established by the Engle findings").

Under Erie, this Court is now bound by the holdings in Martin and Jimmie Lee Brown on questions of Florida preclusion law as it pertains to Engle,[19] notwithstanding the Eleventh

_____

[19] In their supplemental brief, Defendants correctly note that Jimmie Lee Brown conflicts with Martin regarding the extent to which the Phase I approved findings establish legal causation in Engle progeny cases. (See Doc. 78 at 3.) However, as Defendants concede, that question does not affect the due process issue pending before this Court. (Id.) On the question of Florida law relevant to this Court's disposition of Defendants' Rule 16(c) motion—namely, whether the Phase I approved findings preclusively establish the conduct

Circuit's decision in <u>Bernice Brown II</u>.  <u>See</u> <u>Molinos</u>, 633 F.3d at 1348 ("As a general matter, we must follow the decisions of [Florida's] intermediate [appellate] courts" absent "persuasive evidence [which] demonstrates that the highest court would conclude otherwise"); <u>see</u> <u>also</u> <u>Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.</u>, 943 F.2d 1511, 1520 (11th Cir. 1991) (a district court may depart from an appellate mandate where "*an intervening change in the controlling [state] law* dictates a different result" (emphasis in original)).

Accordingly, both sides readily acknowledge that this Court must give preclusive effect to the Phase I approved findings to the same extent the Florida appellate courts in <u>Martin</u> and <u>Jimmie Lee Brown</u> did.  That is, of course, unless doing so would violate Defendants' federal due process rights.  <u>See</u> <u>Salve Regina College v. Russell</u>, 499 U.S. 225, 226 (1991) ("<u>Erie</u> mandates that a federal court sitting in diversity apply the substantive law of the forum State, absent a federal statutory or constitutional directive to the contrary"); <u>see</u> <u>also</u> <u>Richards</u>, 517 U.S. at 797 ("State courts are generally free to develop their own rules for protecting against the relitigation of common issues or the piecemeal resolution of disputes.  We have long held, however, that extreme applications of the doctrine of res judicata may be inconsistent with a federal right that is 'fundamental in character'") (citations omitted).

_____

elements of a progeny plaintiff's claims—<u>Martin</u> and <u>Jimmie Lee Brown</u> are in complete accord.  According to both the First and the Fourth DCAs, the proper interpretation of <u>Engle III</u>'s "res judicata effect" is that the conduct elements of the plaintiffs' claims are established by the Phase I findings; plaintiffs must then prove up the remaining elements of the underlying claims, including legal causation.  <u>See</u> <u>Martin</u>, 53 So.3d at 1067; <u>Jimmie Lee Brown</u>, 70 So. 3d at 715.  How this Court intends to instruct the jury on legal causation is discussed further in Section III, <u>infra</u>.

## B.    The Phase I Findings

Defendants argue that the application of Florida issue preclusion law as announced

in <u>Martin</u> and <u>Jimmie Lee Brown</u> is inconsistent with their federal due process rights.  Citing

to a number of early Supreme Court collateral estoppel cases, Defendants contend "[d]ue

process requires 'certainty' that the earlier jury *actually decided* the specific issues that

Plaintiff seeks to preclude from further litigation."  (Doc. 55 at 2) (emphasis in original).[20]

Defendants assert that <u>Martin</u> and <u>Jimmie Lee Brown</u> cannot be squared with this standard

insofar as they hold that the Phase I findings preclusively establish the conduct elements of

the <u>Engle</u> class claims, regardless of whether the jury actually decided that the particular

conduct relevant to an individual progeny plaintiff was wrongful.

The issue, in a nutshell, is as follows.  The <u>Engle</u> Phase I jury was asked a number

of questions on the Phase I verdict form.  The jury initially found that "smoking cigarettes

cause[s]" certain enumerated diseases (Finding 1) and that "cigarettes that contain nicotine

[are] addictive or dependence producing" (Finding 2).[21] (Phase I Verdict Form, Doc. 35, Ex.

_____

[20]    In particular, Defendants rely on <u>Fayerweather v. Ritch</u>, 195 U.S. 276, 307 (1904); <u>De
Sollar v.Hanscome</u>, 158 U.S. 216, 221 (1895);  <u>Cromwell v. Cnty. of Sac</u>, 94 U.S. 351, 353
(1877); and <u>Russell v. Place</u>, 94 U.S. 606, 608 (1877).   Succinctly, Defendants cite
<u>Fayerweather</u> for the proposition that "the Due Process Clause forbids issue preclusion
where evidence 'was offered at the prior trial upon several distinct issues, the decision of any
one of which would justify the verdict or judgment.'" (Doc. 55 at 4) (quoting <u>Fayerweather</u>,
195 U.S. at 307).  The remaining cases, according to Defendants, "make[ ] clear that issue
preclusion is available only where 'it is certain that the precise fact was determined by the
former judgment.'" (<u>Id.</u>)(quoting <u>De Sollar</u>, 158 U.S. at 221).

[21]    As a general matter, Defendants agree that the Florida Supreme Court acted lawfully
in retaining the Phase I jury's findings on common conduct issues while decertifying the class
with respect to the remaining issues of causation, comparative fault, and damages.  (<u>See</u>
Doc. 65 at 10.)   In fact, Defendants agree that the Phase I findings *do* have certain

7 at 1-2).  The jury also answered "yes" to each of the following questions, which were asked about each separate Defendant:

- Did the Defendant in question "place cigarettes on the market that were defective and unreasonably dangerous" (Finding 3);

- Did the Defendant in question "conceal or omit material information, not otherwise known or available, knowing that the material was false or misleading [sic], or fail[ ] to disclose a material fact concerning or proving the health effects and/or addictive nature of smoking cigarettes" (Finding 4(a));

- Did the Defendant in question enter "into an agreement to conceal or omit information regarding the health effects of cigarette smoking, or the addictive nature of smoking cigarettes, with the intention that smokers and members of the public rely to their detriment" (Finding 5(a));

- Did the Defendant in question sell or supply "cigarettes that were defective in that they were not reasonably fit for the uses intended" (Finding 6); and

- Did the Defendant in question "fail[ ] to exercise the degree of care which a reasonable cigarette manufacturer would exercise under like circumstances" (Finding 8).

(Id. at 2-11.)  While these findings are reasonably specific, Defendants contend that they offer more questions than answers about what the jury actually determined. Taking, for example, the product defect finding (Finding 3), Defendants note that the Engle class did not pursue a single theory of defect, but rather alleged a number of discrete design defects.

_____

preclusive effect in Engle progeny cases.  Specifically, Defendants concede that the findings establish smoking cigarettes causes certain diseases (Finding 1), and that cigarettes containing nicotine are addictive or dependence producing (Finding 2).  (Id. at 10-11; see also Doc. 35 at 6 n.3 ("Defendants agree that Findings 1 and 2 are sufficiently specific to accord them preclusive effect in the progeny litigation.")  In addition, they do not contest preclusive application of the findings as to breach of express warranty (Finding 7).  Their issue is with the findings as to: strict liability (Finding 3); fraud by concealment (Finding 4(a)); civil conspiracy-concealment (Finding 5(a)); breach of implied warranty (Finding 6); and negligence (Finding 8), each of which Defendants contend are too general to be given the effect ascribed to them by Martin and Jimmie Lee Brown.

One such defect theory focused on the Defendants' use of ammonia in their products. The Engle class claimed that Defendants used ammonia to increase the pH of cigarette smoke, which allegedly enhanced the impact of nicotine on the brain. However, "it was undisputed that ammonia was used only in certain brands of cigarettes and only at certain times." (Doc. 35 at 15.) The jury could have accepted the ammonia defect theory while rejecting the others (such as the allegation of misplaced ventilation holes in "light" or "low-tar" cigarettes), and still answered "yes" to the defect question. Thus, Defendants contend, it is impossible to determine which allegation was "actually decided" by Finding 3.[22]

Further, even if it could be shown that Finding 3 rested on the Phase I jury's acceptance of the ammonia allegations, that finding would have no relevance to the claims of a plaintiff who never smoked ammoniated cigarettes. Defendants therefore argue that instructing an Engle progeny jury, e.g., that Defendants "placed cigarettes on the market that were defective and unreasonably dangerous"—without first requiring a showing that the Phase I jury actually determined the specific defect alleged by the progeny plaintiff—gives the findings an overly broad preclusive effect.[23] Such a broad application of the Engle

---

[22] This same flaw, Defendants argue, affects the Waggoners' causes of action for breach of implied warranty, fraud by concealment, conspiracy to conceal, and negligence—i.e., each alleged claim. (See generally Doc. 35.)

[23] Mrs. Waggoner's case demonstrates how the failure to identify a specific defect could be problematic. The Engle class claimed that the "light" cigarette design was defective because smokers could "compensate" by covering up the ventilation holes, inhaling more deeply, taking more puffs, or smoking more cigarettes. According to Defendants, Mrs. Waggoner testified in her deposition that she did not compensate. Thus, as Defendants' counsel argued, "if the defect is with light cigarettes, is that they allowed compensation, we have some great evidence there. But we don't know what the defect was." (Doc. 65 at 100.)

findings violates due process, Defendants conclude, because it fails to foreclose all alternative theories upon which the Phase I jury could have reached its verdict.

Defendants' concerns about the appropriate breadth of the Phase I findings, of course, were previously considered by the Eleventh Circuit in <u>Bernice Brown II</u>.  There, the Court summarized the issue as follows:

> For example, Question 3 on the verdict form asked the jury: "Did one or more of the Defendant Tobacco Companies place cigarettes on the market that were defective and unreasonably dangerous?"  The jury answered "yes," for every time period for every defendant except [one].  Under the defendants' view, the only fact that the jury found was that they sold some cigarette that was defective and unreasonably dangerous during the time periods listed on the verdict form.  That would mean that the finding may not establish anything more specific; it may not establish, for instance, that any particular type or brand of cigarette sold by a defendant during the relevant time period was defective and unreasonably dangerous.  Under the plaintiffs' broader view the jury's finding must mean that all cigarettes the defendants sold were defective and unreasonably dangerous because there is nothing to suggest that any type or brand of cigarette is any safer or less dangerous than any other type or brand.

<u>Bernice Brown II</u>, 611 F.3d at 1335.   Despite acknowledging these practical difficulties created by the Phase I findings, the Eleventh Circuit did not decide the question of whether Defendants' narrow view or plaintiffs' broad view of their meaning was the more appropriate one.  Instead, the Court interpreted Florida preclusion law to place the burden on plaintiffs to show with a "'reasonable degree of certainty' that the specific factual issue was determined in [their] favor," and left it to this Court to determine, after a review of plaintiffs' record-based showing, the true scope of the Phase I approved findings: "Only after Florida law is properly applied to determine the scope of the facts established by the approved findings can it be decided which, if any, elements of the claims are established by them."

<u>Id.</u> at 1336.[24]

Defendants acknowledge that the Eleventh Circuit's record-based approach has been replaced, as a matter of Florida law, by <u>Martin</u> and <u>Jimmie Lee Brown</u>.[25] Despite this, the Eleventh Circuit's analysis remains relevant to the issue before this Court for two reasons: one, because Defendants take the position that an application of Florida law as the Eleventh Circuit outlined it would be consistent with due process (and conversely, that this Court's failure to follow <u>Bernice Brown II</u> would be *inconsistent* with due process);[26] and two, because plaintiffs take the position that they can nevertheless satisfy the Eleventh Circuit's "reasonable degree of certainty" requirements through a "<u>Brown</u> Proffer."[27] Thus, before

---

[24] "It is for the district court to determine, for example, whether the jury's answer to Question 3 establishes only that the defendants sold some cigarettes that were defective and unreasonably dangerous, *or whether the plaintiffs have carried their burden of showing to a reasonable degree of certainty that it also establishes that all of the cigarettes that the defendants sold fit that description.*" <u>Id.</u> (emphasis added).

[25] Defendants can, and do, argue that <u>Martin</u> and <u>Jimmie Lee Brown</u> are inconsistent with existing Florida preclusion law (which they contend was correctly interpreted by the Eleventh Circuit). However, as Defendants recognize, that is a question for the Florida Supreme Court, not this Court.

[26] Specifically, Defendants argue that the "version of Florida preclusion law that the Eleventh Circuit understood would apply in [<u>Bernice Brown II</u>] would have satisfied [the <u>Fayerweather</u>] due process standard by requiring a progeny plaintiff to make a record-based showing that, despite the generic nature of the <u>Engle</u> jury's findings, the evidence was such that the jury necessarily made a single, specific finding in support of its generic verdict on each claim." (Doc. 55 at 2.)

[27] At the September 7, 2011 argument, plaintiffs acknowledged what Defendants had also acknowledged: that the Eleventh Circuit instructed this Court to apply Florida preclusion law; that <u>Martin</u> and <u>Jimmie Lee Brown</u> are now the rule of law in Florida on the <u>Engle</u> preclusion question and are binding on this Court; and that if those decisions comply with federal due process and are thus applied by this Court—as they are being applied every day by Florida state trial courts in <u>Engle</u> progeny cases—plaintiffs would be relieved of any

addressing the merits of Defendants' due process arguments, the Court briefly considers whether plaintiffs' Brown Proffer satisfies the Eleventh Circuit's interpretation of Florida preclusion law so as to obviate the "lurking constitutional issue hover[ing] over the [Engle] poker game." Jimmie Lee Brown, 70 So. 3d at 720 (May, C.J., specially concurring).

## C. Plaintiffs' Brown Proffer

Plaintiffs contend that their Brown Proffer, which relies primarily on citations to the Engle trial record and the Phase I trial judge's Final Judgment and Amended Omnibus Order, "serves to demonstrate, to a reasonable degree of certainty, that [the Phase I approved findings] were actually litigated and decided in Plaintiffs' favor." (Doc. 45 at 1.) Defendants disagree, and think plaintiffs' Brown Proffer "establish[es] conclusively" that plaintiffs' proposed use of the Phase I findings violates due process. (Doc. 50 at 1.) The reason for the disconnect is simple: because the parties have markedly different opinions about what the Phase I jury found, they also have markedly different opinions about what type of evidentiary showing was envisioned by the Eleventh Circuit in Bernice Brown II.

Plaintiffs, unsurprisingly, take a broad view of what is precluded by the Phase I approved findings. They contend that Engle was, at bottom, "a case about addiction to

_____

burden of proving up the conduct elements of their claims. (See Doc. 65 at 76-87.) Despite all of this, plaintiffs' counsel refused to fully embrace Martin and Jimmie Lee Brown, insisting instead that they intend to satisfy the requirements of Bernice Brown II. (See Doc. 65 at 79 (The Court: "[W]hat is your position on Martin? Mr. Nelson: Our position is we're following [Bernice Brown II].")) When pressed on this, plaintiffs expressed concern that their failure to comply with Bernice Brown II would somehow run afoul of the Eleventh Circuit's mandate. For the reasons stated in the first sentence of this footnote, that concern appears unfounded. However, because plaintiffs are adamant that their Brown Proffer is both necessary and sufficient, the Court will address the issue.

cigarettes [containing] nicotine," and it was the presence of that addictive agent in every cigarette—and the health consequences that resulted from the smokers' addiction—which made *all* of Defendants' products defective.  (Doc. 65 at 56.)  Plaintiffs assert that viewed in this context, Findings 1 and 2 ("[c]igarettes that contain nicotine are addictive, and because they are addictive, they cause serious injury or death") demonstrate that the jury necessarily determined "all the tobacco companies' cigarettes were defective because they all contained addictive levels of nicotine."  (Id. at 71.)  The remainder of the findings, plaintiffs posit, flow naturally from this overarching product defect finding; thus, Finding 3 would conclusively establish that Defendants "placed cigarettes on the market that were defective and unreasonably dangerous"—precisely as the trial courts instructed the respective juries in Martin and Jimmie Lee Brown.

Plaintiffs thus interpret Bernice Brown II as requiring only that they demonstrate, to a reasonable degree of certainty, that *all* cigarettes sold by Defendants were defective (or relatedly, that the Engle record is replete with evidence that no such cigarette was safer than any other).[28]  Accordingly, plaintiffs' Brown Proffer (Doc. 45) advances the general

_____

[28]   Defendants interpret the Eleventh Circuit's statement that "there is no indication that the jury actually found as a fact that all types and brands of cigarettes were equally defective and unreasonably dangerous," id. at 1335 n.9, to mean that such a showing is impossible. However, the Eleventh Circuit also stated that "[i]t is for the district court to determine, for example, whether the jury's answer to Question 3 [i.e., that the defendants placed cigarettes on the market that were defective and unreasonably dangerous] establishes only that the defendants sold some cigarettes that were defective and unreasonably dangerous, *or whether the plaintiffs have carried their burden of showing to a reasonable degree of certainty that it also establishes that all of the cigarettes that the defendants sold fit that description.*"  Id. at 1336 (emphasis added).  Given that the Eleventh Circuit did not pass judgment on the appropriate breadth of the Phase I findings, see supra at 30-31, it is evident the Court did not foreclose at least the possibility that the jury found all of Defendants'

proposition (with record support) that "all of the evidence" in the <u>Engle</u> trial record "is focused on the addictiveness of the product and the serious injury that results therefrom. The <u>Brown</u> proffer is all about the defect and all about the fraud and the conspiracy related to the defect." (Doc. 65 at 79-80.) Because of this generalized approach, plaintiffs' <u>Brown</u> Proffer actually *highlights* the myriad defect, negligence, and concealment theories advanced during the Phase I trial in an attempt to prove that the approved findings were "well supported in the <u>Engle</u> trial record." (Doc. 44 at 2.)

Defendants acknowledge that <u>Bernice Brown II</u> allows plaintiffs to go beyond the Phase I findings and to comb the <u>Engle</u> trial record for evidence of what the jury determined; they further acknowledge that that record is rife with evidence of Defendants' wrongful conduct. However, Defendants argue that the record-based showing envisioned by the Eleventh Circuit is one which isolates specific findings that the <u>Engle</u> jury *must have made* to reach its general verdict, because only those findings—assuming they are relevant to the progeny plaintiff in question—can be given preclusive effect. Under Defendants' view, plaintiffs' <u>Brown</u> Proffer "proves what Defendants have been saying all along, namely, that the <u>Engle</u> jury was presented with so many differing and contradictory theories that [no] progeny plaintiff can demonstrate to any degree of certainty what the jury 'actually decided' beyond the generic propositions reflected in the findings themselves." (Doc. 55 at 3.) But Defendants go even further than this, claiming that even if plaintiffs were to compile the most thorough <u>Brown</u> Proffer imaginable to support their all-cigarettes-are-defective theory, it *still*

cigarettes defective. Rather, as plaintiffs contend, the Court simply placed the burden on plaintiffs to prove it. (<u>See</u> Doc. 65 at 80-82.)

would not satisfy either the Eleventh Circuit's requirements or federal due process such that the Phase I findings could be applied in the manner plaintiffs seek.[29]  In other words, their position is that due to the generality of the Phase I findings and the multiple theories of liability advanced in the trial record, plaintiffs simply can't get there (due process) from here (a Brown Proffer).

This Court could review plaintiffs' Brown Proffer in detail to determine whether it "demonstrate[s], to a reasonable degree of certainty, that [the Phase I approved findings] were actually litigated and decided in Plaintiffs' favor," and thus complies with Bernice Brown II. (Doc. 45 at 1.)  However, Defendants' position that no Brown Proffer could ever satisfy due process renders that exercise fruitless.  Even if this Court were to accept outright plaintiffs' interpretation of the Phase I findings as having determined "that all the tobacco companies' cigarettes were defective because they all contained addictive levels of nicotine," and thus, that a compliant Brown Proffer requires only confirmation that the Phase I jury was presented with "ample evidence" supporting the multiple theories upon which its findings could have rested, Defendants would respond with the same argument they are making now—that the Proffer improperly fails to foreclose alternate theories of liability, in violation of their due process rights.  And we would be back to square one.

Defendants agree that Martin and Jimmie Lee Brown constitute the current Florida issue preclusion law to be applied in Engle progeny cases, and acknowledge that Florida trial

---

[29]  As Defendants put it, "[s]ubmitting the entire Engle record—with its wide-ranging evidence, directed at establishing multiple facts to support a panoply of distinct theories—as a 'Brown Proffer' only confirms that Plaintiff[s] cannot satisfy any standard of preclusion that comports with due process."  (Doc. 55 at 1.)

courts are giving preclusive effect to the Phase I findings in accordance with those decisions. Rather than decide the issue in this federal case on the basis of plaintiffs' record-based showing—a showing which <u>Martin</u> and <u>Jimmie Lee Brown</u> do not require—the more appropriate approach is to tackle head-on Defendants' position that the application of Florida preclusion law in <u>Martin</u> and <u>Jimmie Lee Brown</u> is inconsistent with due process. The Court therefore declines plaintiffs' invitation to hold that their <u>Brown</u> Proffer satisfies the requirements of <u>Bernice Brown II</u> or of federal due process, as neither finding is required to decide the issue before the Court.

### D. Due Process

While "[s]tate courts are generally free to develop their own rules for protecting against the relitigation of common issues or the piecemeal resolution of disputes," <u>Richards</u>, 517 U.S. at 797, those rules and their attendant applications by subsequent state or federal courts are subject to a constitutional backstop: the Due Process Clause. Due process protects those rights "so rooted in the traditions and conscience of our people as to be ranked as fundamental." <u>Snyder v. Massachusetts</u>, 291 U.S. 97, 105 (1934). Accordingly, the Supreme Court has held that "extreme applications of the doctrine of res judicata may be inconsistent with a federal right that is 'fundamental in character.'" <u>Richards</u>, 517 U.S. at 797 (quoting <u>Postal Tel.</u>, 247 U.S. at 476); <u>see</u> <u>also</u> <u>Kremer v. Chem. Constr. Corp.</u>, 456 U.S. 461, 481 (1982) (holding that for federal court to grant full faith and credit to state court judgment, state proceedings must "satisfy the minimum procedural requirements of the Fourteenth Amendment's Due Process Clause"); <u>Fayerweather</u>, 195 U.S. at 297-99 (recognizing that federal/state court can violate Fifth/Fourteenth Amendment due process where giving

36

preclusive effect to state court judgment would "depriv[e] [a party] of their property without any judicial determination of the fact upon which alone such deprivation could be justified"). The critical first step in this constitutional analysis is to determine the fundamental federal right at issue. Cf. Richards, 517 U.S. at 797 n.4. Only then can it be determined whether the application of res judicata in question is so "extreme" as to be inconsistent with that right. Cf. id. at 803.

Defendants' due process argument rests entirely on one premise—that a state's strict adherence to the boundaries of traditional preclusion law, as set forth in the Fayerweather line of cases, supra n.19, is a "fundamental federal right." That premise can be subdivided into two main hypotheses. The first is Defendants' contention that the federal common law of issue preclusion is coextensive with due process—in other words, that the boundaries of traditional preclusion law represent a *substantive* limitation on the states' ability to "develop their own rules for protecting against the relitigation of common issues or the piecemeal resolution of disputes." The second is Defendants' mostly undeveloped theory that, to the extent Florida has deviated from those traditional boundaries, it has removed a constitutionally guaranteed procedural protection against the deprivation of a fundamental right. The Court addresses each of these matters in turn.

1.    *Fundamental Right to "Traditional" Application of Issue Preclusion?*

Defendants first contend that it is a "universally accepted principle of Anglo-American law that issue preclusion is limited to matters that were actually decided in a prior proceeding. As far back as the 19th century, courts agreed that a party cannot be precluded from litigating an issue unless it could be shown with certainty that 'the precise question was raised and

determined in the former suit.'" (Doc. 35 at 10) (quoting <u>Russell</u>, 94 U.S. at 608). Defendants thus assert that "[d]ue process requires 'certainty' that the earlier jury *actually decided* the specific issues that Plaintiff seeks to preclude from further litigation;" or, more precisely, that due process "forbids issue preclusion where evidence 'was offered at the prior trial upon several distinct issues, the decision of any one of which would justify the verdict or judgment.'" (Doc. 55 at 2, 4) (emphasis in original); <u>supra</u> n.20. They argue that the version of Florida preclusion law advanced in <u>Engle III</u>, <u>Martin</u> and <u>Jimmie Lee Brown</u>, to the extent it allows for preclusion without requiring a definitive showing that every specific issue was "'actually litigated and determined in the original action,'" falls short of this "constitutional standard." (Doc. 55 at 4) (quoting <u>Cromwell</u>, 94 U.S. at 353).

Defendants' primary support for this position is <u>Fayerweather</u>, in which they contend the Supreme Court "*expressly held*" those traditional limitations on preclusion "to be *constitutionally required*." (Doc. 35 at 11) (emphasis added). <u>Fayerweather</u> did recognize that improper preclusive application of a state court judgment in a later federal or state proceeding *can* be inconsistent with Fifth or Fourteenth Amendment procedural due process. See <u>Fayerweather</u>, 195 U.S. at 297-99. What it did *not* do, however, is announce that litigants have a substantive right to the application of traditional preclusion doctrine. In fact, <u>Fayerweather</u> analyzed the issue before it, which involved the proper preclusive effect of a state judgment entered in an action on a will, under a different constitutional rubric altogether. The question before the Court was whether the trial court had determined the validity of certain releases executed by the plaintiffs—which would have destroyed their otherwise undisputed right to share in the Fayerweather estate—so that preclusive effect could be given

to that issue in a collateral federal action. Because the validity of the releases was "the fact upon which *alone*" the petitioners would be deprived of their right to share in the estate, the Court found that an application of res judicata absent proper determination of that fact would work an *arbitrary deprivation of petitioners' property.* Id. at 298-99 (emphasis added).[30] Accordingly, contrary to Defendants' assertions, the Fayerweather Court did not announce that a party has a "fundamental federal right" to a strict application of traditional preclusion law.

Nor does Fayerweather stand for the broader proposition that an application of state preclusion law which fails to foreclose all alternate theories of liability necessarily violates due process. The issue in Fayerweather turned upon whether the trial judge, who was sitting without a jury and had entered a general verdict with no findings of fact, had actually decided whether the releases were valid. Petitioners called the trial judge as a witness in the subsequent litigation, where he testified (some six years after the fact) that he had *not* considered the question of the validity of the releases in deciding the case. See id. at 306. The Supreme Court found that the testimony of the trial judge was inappropriate, and noted that, apart from the judge's testimony, there was nothing "to disturb the conclusion which follows from an examination of the record, that the validity of the releases was actually determined. Of course, *the omission of special findings means nothing, for the judgment implies a finding of all necessary facts.*" Id. at 307 (emphasis added). The Court then found:

Nothing can be clearer from this record than that the question of the validity of

---

[30] This portion of the Court's opinion is not dicta because the constitutional question formed the basis of the Court's jurisdiction.

the releases was not only *before the state courts, but was considered and determined by them*, and *the regularity of the procedure was sustained by the highest court of the state.* The question was, as affirmed by counsel for these appellants, put in issue by the pleadings, and its determination was a necessary prerequisite to an adverse judgment. It was referred to by all the courts in their opinions, was affirmatively decided by the general term, its decision sustained by the court of appeals, and reaffirmed by that court, by a refusal to amend its remittitur.

Id. at 308 (emphasis added). The Court thus upheld the application of collateral estoppel against petitioners, despite the fact that the judgment given preclusive effect arose from a general verdict and the finder of fact *specifically disavowed* having determined the issue in question. As a result, Defendants' contention that the Fayerweather Court "*expressly held*" that giving "'unwarranted effect to a decision' by accepting as 'a conclusive determination' a verdict 'made without any finding of the fundamental fact' would violate due process" is patently incorrect. (Doc. 35 at 11) (emphasis added). In fact, because the Court ultimately determined that the application of collateral estoppel was proper, the doctrine's due process implications *did not factor into the Court's decision whatsoever.* See Fayerweather, 195 U.S. at 307-08.

Fayerweather certainly does support Defendants' contention that a proper application of the *federal common law* of collateral estoppel required the precise fact to have been determined by the former judgment.[31] But the fact that the Court bifurcated its analysis on

---

[31]   In Erie, the Supreme Court declared that "[e]xcept in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state. . . . There is no federal common law." Erie, 304 U.S. at 78. Post-Erie, the analysis in Fayerweather would have looked much different—the Court would have been bound to apply principles of New York state preclusion law to determine whether the validity of the releases was, in fact, properly determined by the trial court. See Allen v. McCurry, 449 U.S. 90, 96 (1980) ("Indeed, though the federal courts may look to the common law or to the policies

the question of whether an alleged relaxation of this requirement could result in a constitutional violation—asking whether this was an improper application of res judicata on the one hand, and whether that application infringed on the right to not be arbitrarily deprived of one's property on the other—cripples Defendants' argument that due process and traditional preclusion law are one and the same.[32] The other early Supreme Court collateral estoppel cases cited by Defendants—DeSollar, Russell, and Cromwell, all of which, like Fayerweather, predate Erie—do not mention due process at all. Accordingly, like Fayerweather, they also do not stand for the proposition that the application of a state's collateral estoppel law in derogation of any particular traditional preclusion principle would be necessarily violative of due process. And Defendants have provided no case that does.[33]

_____

supporting res judicata and collateral estoppel in assessing the preclusive effect of decisions of other federal courts, Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so"); Kremer, 456 U.S. at 481-82 ("It has long been established that § 1738 *does not allow federal courts to employ their own rules of res judicata in determining the effect of state judgments.* Rather, it goes *beyond the common law* and commands a federal court to accept the rules chosen by the State from which the judgment is taken") (emphasis added).

[32] The pre-Erie collateral estoppel cases cited by Defendants describe the parameters of the federal common law of issue preclusion at that time. Those parameters are not, however, automatically coextensive with federal due process, absent a later Supreme Court case which says so. In fact, the Supreme Court's recognition of states' ability to fashion their own preclusion rules post-Erie suggests that the federal common law of issue preclusion is *not* strictly coextensive with due process. See, e.g., Blonder-Tongue Laboratories, Inc. v. University of Ill. Foundation, 402 U.S. 313, 323-27 (1971) (discussing rejection of the doctrine of mutuality of estoppel, which began with a decision of the California Supreme Court and ultimately worked a "fundamental change in the common-law tradition" of collateral estoppel).

[33] As noted supra, another Judge of this Court previously found that application of the Engle findings to establish any element of a progeny plaintiff's claims would violate

41

As _Fayerweather_ itself reinforces, a state's departure from common law issue
preclusion principles does not implicate the Constitution unless that departure also violates
"the minimum procedural requirements of the Fourteenth Amendment's Due Process
Clause," _Kremer_, 456 U.S. at 480; see also _Oberg_, 512 U.S. at 432 (state's abrogation of
judicial review of excessive punitive damage awards removed lone procedural safeguard
against arbitrary deprivation of property);[34] _Richards_, 517 U.S. at 802 (state's application of
res judicata gave preclusive effect to a judgment against litigants without affording them
opportunity to be heard).  Likewise, this federal Court does not abridge Defendants' due
process rights by affording preclusive effect to the Phase I approved findings as Florida
courts have done in _Martin_ and _Jimmie Lee Brown_ and as it is bound to do pursuant to _Erie_

_____

Defendants' due process rights. _Bernice Brown I_, 576 F.Supp.2d at 1346.  That decision
relied upon _Honda Motor Co. v. Oberg_, 512 U.S. 415, 430 (1994), to reach the conclusion
that "this Court is constitutionally bound to strictly apply the doctrine of issue preclusion
consistent with its common law origins."  Id. at 1345-46.  _Bernice Brown I_ was ultimately
vacated by the Eleventh Circuit, which considered the issue solely as a matter of Florida law,
declined to address due process, and did not mention the federal common law origins of
issue preclusion.  _Bernice Brown II_, 611 F.3d at 1336.  Still, Defendants contend that the
Eleventh Circuit acknowledged the common law of issue preclusion as representing the _floor_
of due process, but did not have occasion to decide the issue because of its understanding
of Florida preclusion law at the time.  See _Bernice Brown II_, 611 F.3d at 1334 ("[D]efendants
contend that using the findings to establish facts that were not decided by the jury would
violate their due process rights. We need not decide that constitutional issue, _because under
Florida law the findings could not be used for that purpose anyway_") (emphasis added).  This
Court does not agree that the Eleventh Circuit made any pronouncement whatsoever about
the parameters of due process.  With the benefit of intervening state and federal caselaw,
and for the additional reasons stated in this section, this Court departs from the analysis in
_Bernice Brown I_ regarding the constitutional requirements of due process as it applies in
these _Engle_ progeny cases.

[34]   Despite its holding, the _Oberg_ Court noted: "[o]f course, not all deviations from
established procedures result in constitutional infirmity."  Id. at 430.

42

and the Full Faith and Credit Act, unless doing so violates a fundamental right protected by the Due Process Clause.  See Fayerweather, 195 U.S. at 299.

      *2.    Inconsistent with Any Recognized Fundamental Right?*

This brings us full circle to the question of exactly which fundamental right is allegedly being offended here.  Defendants contend that "giving preclusive effect to the Phase I findings without imposing the traditional requirement that the identical issue was actually decided in the prior proceeding would comprise an arbitrary deprivation of the Defendants' federal due process rights guaranteed under the Fourteenth Amendment." (Doc. 35 at 10) (quotation omitted).  But they consistently fail to identify exactly *which* constitutionally guaranteed right is being "arbitrarily deprived," or how.[35]

Instead, Defendants cast a wide net for any constitutional hook which would turn Florida's alleged misapplication of traditional preclusion law into a departure from the tenets of fundamental fairness.  For example, Defendants cite to Oberg, 512 U.S. at 430, for the proposition that Martin and Jimmie Lee Brown have wrought an "abrogation of a well-established common-law protection against arbitrary deprivations of property."  (Doc. 35 at 11.)  However, they do not explain how this or any court's application of the Engle findings in accordance with Florida preclusion principles either arbitrarily deprives them of property or removes all safeguards which would protect them from such an occurrence.  They bury deep in a footnote the contention that Defendants "have a due process right to a 'full and fair

---

[35]    This is primarily because Defendants' argument is premised on the notion that they enjoy a fundamental "right" to a "strict" application of preclusion law, which they do not, for the reasons already stated.

opportunity' to litigate all elements of all of plaintiffs' claims and to receive an actual finding of fact as to each," (Doc. 55 at 10 n.3) (quoting Kremer, 456 U.S. at 480) (emphasis added), but do not pursue this argument any further.[36] And they cite to Richards—a case in which the Supreme Court reversed a state court's application of res judicata on the grounds that it deprived plaintiffs of the opportunity to be heard—for the proposition that the Florida courts' use of the Engle findings is "extreme," (Doc. 35 at 11), but do not otherwise adopt the Court's analysis or claim that they have been denied their day in court.

Thus, while Defendants' argument is long on how Martin and Jimmie Lee Brown mark an "extreme" departure from traditional issue preclusion, it is short on why this alleged departure is *unconstitutional*. Their argument is therefore classic bootstrapping: essentially, Defendants are contending that Florida's "extreme" application of preclusion law violates due process because it is an "extreme" application of preclusion law. Nevertheless, the Court will examine the traditional attributes of the of Due Process Clause's protections to see if Defendants' constitutional rights might be violated by Florida's preclusive application of the Phase I findings.

---

[36] And for good reason—a cursory review of Kremer, which found that the plaintiff there had a "full and fair opportunity" to litigate an employment discrimination claim even though the state's administrative dismissal of his claim ultimately barred his ability to seek redress under Title VII in federal court—shows that it does not support the proposition for which Defendants have cited it. See Kremer, 456 U.S. at 480. Further, Kremer's "full and fair opportunity" language is *preclusion* language, not due process language. See Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322, 326-28 (1979) (noting that while federal preclusion law requires a "full and fair opportunity to litigate," the due process right underpinning this principle is the opportunity to be heard); Blonder-Tongue, 402 U.S. at 328-29.

### A. Arbitrary Deprivation of Property?

As noted <u>supra</u>, the Supreme Court has found that a state or federal court's preclusive application of a state court judgment can, under certain circumstances, directly violate the fundamental constitutional protection against arbitrary deprivation of property. <u>See Fayerweather</u>, 195 U.S. at 299. More recently, the Court held that a state's "abrogation of a well-established common-law *protection* against arbitrary deprivations of property raises a presumption that its procedures violate the Due Process Clause." <u>Oberg</u>, 512 U.S. at 430 (emphasis added). The Court thus considers whether the preclusive application of the Phase I approved findings compelled by Florida law deprives Defendants of this fundamental right either directly (i.e., application of the findings directly leads to a judgment against Defendants) or indirectly (i.e., via Florida's alleged deviation from traditional preclusion rules).

As to the first question, whether the proposed preclusive application of the Phase I approved findings "depriv[es] them of their property without any judicial determination of the fact *upon which alone such deprivation could be justified*," <u>Fayerweather</u>, 195 U.S. at 299 (emphasis added), the answer must be no. As the Florida Supreme Court noted in <u>Engle III</u>, the Phase I jury "decided issues related to [Defendants'] conduct but did not consider whether any class members relied on [Defendants'] misrepresentations or were injured by [Defendants'] conduct." <u>Engle III</u>, 945 So. 2d at 1263. In other words, the Phase I jury "did not determine whether the defendants were liable to anyone." <u>Id.</u> (quotation omitted). Defendants continue to vigorously litigate each and every remaining issue in each and every progeny suit, meaning that preclusive application of the Phase I approved findings in no way deprives them of property without "judicial determination of the fact upon which alone" would

45

result in a judgment in favor of any progeny plaintiff.[37]  Perhaps as a result, Defendants do

not even imply that affording the Phase I approved findings preclusive effect will arbitrarily

deprive them of property in this traditional sense.

Defendants do contend, however, that Florida's alleged abandonment of a tenet of

traditional preclusion law is the sort of "abrogation of a well-established common-law

protection against arbitrary deprivations of property," Oberg, 512 U.S. at 430, that violates

Fourteenth Amendment due process.  In Oberg, the Court addressed the question of "what

procedures are necessary to ensure that punitive damages are not imposed in an arbitrary

manner[; m]ore specifically, the question is whether the Due Process Clause requires judicial

review of the amount of punitive damages awards."  Id. at 420.  The Supreme Court noted

that "[p]unitive damages pose an *acute danger* of arbitrary deprivation of property," and

expressed concern that in the absence of traditional judicial review, Oregon law provided no

procedure for reducing or setting aside an excessive punitive damages award on the sole

basis of the amount awarded.  Id. at 432 (emphasis added).  The Court ultimately found that

Oregon's lack of procedure amounted to a due process violation:

> Judicial review of the amount awarded was *one of the few procedural safeguards which the common law provided against that danger.*  Oregon has *removed that safeguard without providing any substitute procedure* and without any indication that the danger of arbitrary awards has in any way subsided over

---

[37]   As a further illustration of this point and nothing more, Courtroom View Network's "Engle Verdict Tracker" website, which has "gather[ed] and sort[ed] the results of all Engle-progeny tobacco trials since the first [such] verdict in February 2009," reports that as of November 15, 2011, there have been 53 Engle progeny cases tried to verdict, which have resulted in 36 wins for progeny plaintiffs and 16 wins for Defendants.  See CVM's Engle Verdict Tracker, *available at* http://info.courtroomview.com/engle-verdict-tracker (last visited December 20, 2011).

time.  For these reasons, we hold that Oregon's denial of judicial review of the size of punitive damages awards violates the Due Process Clause of the Fourteenth Amendment.

Id. (emphasis added).

Though Defendants cite to Oberg for the general proposition that a change to traditional preclusion law removes a protection against the arbitrary deprivation of property, they do not explain how an application of Florida law which gives preclusive effect to the conduct elements of plaintiffs' claims has eliminated all safeguards against such a deprivation in the context of the Engle case.  And unlike in Oberg, where the Supreme Court expressly noted that Oregon had removed one of the few procedural safeguards against excessive punitive damages, Florida law continues to offer Defendants a panoply of procedural protections against an arbitrary deprivation of their property.  For example, in order to even obtain the benefit of the Phase I approved findings, Mrs. Waggoner must first establish class membership.  To do so, she must prove to a jury, *inter alia*, (i) that she was addicted to one of Defendants' cigarettes containing nicotine;[38] (ii) that such addiction was the legal cause of her lung cancer;[39] (iii) that those diseases manifested before the class membership cut-off

---

[38]  As the Temporary Special Master reported, "the dichotomy between addiction and choice" is an issue which dominates Engle progeny trials.  TSM Report at 46.  "Defendants always argue that Plaintiff enjoyed smoking and smoked for reasons other than addiction, that Plaintiff was strong-willed and stubborn, that Plaintiff ignored warnings and pleas and that Plaintiff did not really try or want to quit.  This defense argument has been successful in many cases."  Id.

[39]  This, too, is far from a foregone conclusion.  As noted by the Temporary Special Master, Defendants have successfully challenged medical causation in state court Engle progeny cases.  See id. at 47.

date;[40] and (iv) that no other procedural bar prevents any aspect of her claim.[41]  If a jury

makes those findings in Mrs. Waggoner's favor, she is entitled to application of the Engle

Phase I findings as directed by Martin and Jimmie Lee Brown.  However, she must still prove

legal causation for each of her asserted claims against each Defendant, reliance with regard

to her fraud claims, and entitlement to damages.  Assuming the jury finds Defendants liable,

it might still return a zero award on the basis of Mrs. Waggoner's comparative fault.  Even if

the jury does award Mrs. Waggoner damages, that award is subject to multiple layers of

judicial review for trial error and excessiveness.[42]  Given all of this, it is hard to see how

Florida's preclusive application of the Engle Phase I findings, in and of itself, works an

arbitrary deprivation of Defendants' property.

---

[40]   In Engle III, the Florida Supreme Court determined that the cut-off date for class membership was November 21, 1996, meaning that a would-be class member's disease must have manifested itself before that date.  Engle III, 945 So. 2d at 1275.

[41]   Assume, for example, that Mrs. Waggoner first developed COPD, and years later developed lung cancer, both of which were caused by smoking.  Defendants have successfully argued that if suit was not brought within the limitations period relevant to discovery of the COPD, Florida's "first-injury rule" would bar her recovery for all subsequent injuries (i.e., her lung cancer).  TSM Report at 52.

[42]   It is worth noting that the Third DCA in Engle II threw out the *$145 billion* punitive damage verdict awarded to the Engle class in Phase I because the award was made in absence of findings of liability and compensatory damages and because the award was excessive under state and federal law, Engle II, 853 So. 2d at 450, 456-57, a decision upheld by the Florida Supreme Court in Engle III.  Engle III, 945 So. 2d at 1254.  To the extent Defendants feel that an individual punitive damage verdict in any subsequent progeny case is excessive, Defendants may challenge that award in the same manner and on the same state and federal grounds, and the reasonableness of the award will ultimately be assessed pursuant to the Supreme Court's constitutional standard in BMW of N. Am. v. Gore, 517 U.S. 559 (1996).  Accordingly, Florida's safeguards against the arbitrary deprivation of property, which were absent in Oberg, are working as designed to protect Defendants' constitutional interests.

B.       *Deprivation of the Opportunity to be Heard?*

Defendants next claim that it is inconsistent with due process for this Court to apply the Phase I approved findings in way that "deprive[s] Defendants of an opportunity to contest issues that were not actually decided against them in the Engle proceedings."  (Doc. 55 at 1).  Defendants have cited no case in which the Supreme Court has found that the failure to abide by traditional preclusion law's "actually decided" requirement runs afoul of a litigant's opportunity to be heard.  When pressed at oral argument, Defendants' counsel could provide only one analogue—Richards.

Richards involved taxpayers who filed a state-court action claiming that a county occupational tax was unconstitutional.  517 U.S. at 794-95.  The trial court granted summary judgment for the county on state constitutional grounds, finding that the taxpayers' claims were barred by a prior adjudication of the tax in a separate action to which the taxpayers were not parties.  Id. at 795.  The trial court's decision was ultimately upheld by the Alabama Supreme Court, which found that this relaxation of privity was appropriate under Alabama preclusion law because the interests of the taxpayers in Richards and the taxpayers in the former action were "essentially identical."  Id. at 796.

The Supreme Court took certiorari directly from the Alabama Supreme Court, and reversed.  Id. at 797.  The Court began by noting that while "state courts are generally free to develop their own rules for protecting against the relitigation of common issues or the piecemeal resolution of disputes . . . extreme applications of the doctrine of res judicata may be inconsistent with a federal right that is 'fundamental in character.'"  Id.  The Court identified the "fundamental right" at issue in Richards as "the opportunity to be heard," which it termed

49

"an essential requisite of due process of law in judicial proceedings:"

> 'And as a State may not, consistently with the Fourteenth Amendment, enforce a judgment against a party named in the proceedings without a hearing or an opportunity to be heard, so it cannot, without disregarding the requirement of due process, give a conclusive effect to a prior judgment against one who is neither a party nor in privity with a party therein.'

Id. at 797 n.4 (quoting Postal Tel., 247 U.S. at 476); see also id. at 794 ("[I]t would violate the Due Process Clause of the Fourteenth Amendment to bind litigants to a judgment rendered in an earlier litigation to which they were not parties and in which they were not adequately represented") (citing Hansberry v. Lee, 311 U.S. 32, 37 (1940)).

Though it noted that "the limits on a state court's power to develop estoppel rules reflect the general consensus in Anglo-American jurisprudence that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process," the Court recognized that there were instances in which this very basic right, the right to receive notice and an opportunity to litigate a claim before being forever foreclosed from doing so, had been relaxed—for example, in the class action or representative context.[43] Id. at 798-99. But the Court found Alabama's "relaxation" of privity inappropriate, because there was no relation whatsoever between the taxpayers in the prior proceeding and the taxpayers challenging the county occupational tax in Richards. Id. at 801. As the prior litigants were mere "strangers," and the

---

[43]    "Most notably, there is an exception when it can be said that there is 'privity' between a party to the second case and a party who is bound by an earlier judgment.  For example, a judgment that is binding on a guardian or trustee may also bind the ward or the beneficiaries of a trust.  Moreover, although there are clearly constitutional limits on the 'privity' exception, the term 'privity' is now used to describe various relationships between litigants that would not have come within the traditional definition of that term." Id. at 798.

50

Richards taxpayers neither participated in nor had the opportunity to participate in the prior litigants' action, the Supreme Court concluded that "due process prevents the former from being bound by the latter's judgment." Id. at 802.

Unlike Richards, the parties to the Engle case and the Engle progeny cases are one and the same. Recognizing as much, at oral argument, counsel for Defendants contended that the application of collateral estoppel in this case is more "extreme" than that in Richards because while there has been "a lot of relaxation of privity [requirements]," Martin and Jimmie Lee Brown effected a change on "something that's fundamental to due process, which is, you don't impose liability on somebody unless some jury has actually determined that you're liable." (Doc. 65 at 41.) Yet, the Supreme Court has made clear post-Fayerweather that *privity* is the touchstone for any analysis of res judicata's due process implications. See Richards, 517 U.S. at 797 n.4; Blonder-Tongue, 402 U.S. at 329 ("Some litigants-*those who never appeared in a prior action*-may not be collaterally estopped without litigating the issue. They have never had a chance to present their evidence and arguments on the claim. Due process prohibits estopping them despite one or more existing adjudications of the identical issue which stand squarely against their position") (emphasis added); Hansberry, 311 U.S. at 40 ("State courts are free to attach such descriptive labels to litigations before them as they may choose and to attribute to them such consequences as they think appropriate under state constitutions and laws, subject only to the requirements of the Constitution of the United States. But when the judgment of a state court, ascribing to the judgment of another court the binding force and effect of res judicata, is challenged for want of due process it becomes the duty of this Court to examine the course of procedure in both litigations to ascertain

*whether the litigant whose rights have thus been adjudicated has been afforded such notice and opportunity to be heard as are requisite to the due process which the Constitution prescribes*") (emphasis added and citation omitted).  Accordingly, every modern Supreme Court case which has addressed the intersection of preclusion and due process has found privity to be the *one* fundamental right which preclusion doctrine must not abrogate.  See, e.g., Richards, 517 U.S. at 797 n.4; Blonder-Tongue, 402 U.S. at 329; Parklane Hosiery, 439 U.S. at 327 n.7 ("It is a violation of due process for a judgment to be binding on a litigant who was not a party or a privy and therefore has never had an opportunity to be heard"); Hansberry, 311 U.S. at 40-41 ("It is a principle of general application in Anglo-American jurisprudence that one is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process. A judgment rendered in such circumstances is not entitled to the full faith and credit which the Constitution and statute of the United States prescribe, and judicial action enforcing it against the person or property of the absent party is not that due process which the Fifth and Fourteenth Amendments require") (citations omitted).

Moreover, while Alabama's application of res judicata in Richards *totally* foreclosed the taxpayers' opportunity to litigate their claims, that is simply not the case here.  Engle began as a class action in which all of the progeny plaintiffs and each of the Defendants, represented by able counsel, were interested parties.  In Phase I, the jury—after a *year-long* trial in which myriad defect, negligence and fraud theories were vigorously litigated—determined "*common issues* relating exclusively to the defendants' conduct" vis-a-vis the causes of action raised by the Engle class.  Engle III, 945 So. 2d at 1256 (emphasis

added).  In other words, the <u>Engle</u> Phase I trial was conducted for the explicit purpose of determining issues related to the Defendants' conduct which were common to the *entire class*, meaning Defendants had every reason to litigate each potential theory of liability to the fullest extent possible.  Further still, the Phase I jury's findings as to Defendants' conduct were reviewed by the state's highest court, which approved the findings for future preclusive use, with the caveat that those findings *did not* determine Defendants' *ultimate* liability to any individual class member.  <u>Id.</u> at 1263.  Thus, as the Eleventh Circuit recognized, these same tobacco Defendants "*had their day in court on the 'common issues' of fact that were decided in Phase I*, and later approved by the Florida Supreme Court, but they did not have their day in court on the broader questions involving the causes of action the class asserted [i.e., individualized issues such as legal causation, comparative fault, and damages], which were left undecided."  <u>Bernice Brown II</u>, 611 F.3d at 1333 (emphasis added).

Further evidence of the deficiency of Defendants' due process argument can be found by analyzing Phase II of the original <u>Engle</u> case.  In Phase II, three plaintiffs (Mary Farnan, Frank Amadeo and Angie Della Vecchia), armed with the Phase I findings, proved up causation, damages, reliance and proportionate fault.  The jury awarded compensatory damages to each, and the Florida Supreme Court affirmed the compensatory judgments as to Farnan and Della Vecchia.[44]  The judgments in those cases were achieved by marrying the Phase I findings with the Phase II findings, *just as plaintiffs seek to do in the remainder of the progeny cases.*  Defendants do not contend that their due process rights were violated

---

[44]    In <u>Engle III</u>, the Florida Supreme Court determined that Amadeo's action was barred by the statute of limitations.

53

in Phase II of the Engle case—rather, they argue that Engle Phase II was different in two ways: one, because the same jury made both the conduct and causation determinations; and two, because the use of the Phase I findings in Phase II wasn't technically collateral estoppel, but rather the continuation of the original litigation. These attempts to distinguish Phase II's importance are unpersuasive, given the unique structure of this litigation. Defendants do not deny that they had their day in court, in a class action setting, on the "common issues" of the claims asserted by the Engle class. Progeny plaintiffs, to take advantage of the Phase I findings, must assert the same claims raised in the class action. As such, it simply does not make sense as a matter of due process that it was acceptable for Farnan and Della Vecchia to match the Phase I findings with the Phase II findings, but it is unacceptable for subsequent plaintiffs, each of whom were members of the same class, to do the exact same thing.[45] Such a conclusion ignores that had the Engle class never been decertified, the Phase I findings would have *already* conclusively established the conduct elements for every member of the class, including the Waggoners. By decertifying the class and requiring progeny

---

[45]    The fact that the same jury made both the conduct and causation determinations for the Phase II plaintiffs, but a different jury would make the latter determination in progeny cases, does not change this conclusion. Given the extensive litigation of Defendants' conduct during Phase I—where all progeny plaintiffs were interested parties—the present scenario is perhaps most analogous to the punitive damages context, where one jury makes certain findings as to a defendant's wrongful conduct and a second jury makes additional, more detailed findings about whether that conduct was the legal cause of plaintiff's injury and, if so, whether the plaintiff is entitled to punitive damages. The Supreme Court has expressed no general due process concerns with such a bifurcated procedure. See State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 414 (2003) (discussing bifurcated action against insurer alleging bad faith, fraud, and intentional infliction of emotional distress, where first jury determined bad faith and second jury determined insurer's ultimate liability for fraud, intentional infliction of emotional distress, and compensatory and punitive damages).

plaintiffs to bring individualized damages claims, the Florida Supreme Court gave Defendants *greater* procedural protection than they enjoyed under the original class action posture.

As Defendants' counsel recognized at oral argument, the Engle progeny litigation is unlike any this Court has seen or is likely to see again.  (Doc. 65 at 31 ("I'll be the first to admit that this situation is *sui generis* and this hopefully will not be replicated anywhere else."))  Such a unique situation demands some flexibility to accommodate the due process interests of *both* the Defendants *and* the thousands of Engle progeny plaintiffs.  Fortunately, the Supreme Court has recognized that the Due Process Clause retains such flexibility.  See Kremer, 456 U.S. at 483.  The Engle progeny cases are in essence a *sui generis* extension of the original litigation; the Phase I findings may be given the preclusive effect afforded them by Engle III, Martin and Jimmie Lee Brown without running afoul of the Due Process Clause.

## III.    Jury Instructions

As this Court is bound to give the Phase I approved findings the same preclusive effect as a Florida court would, and has determined that doing so does not offend due process, the Court next considers one lingering question about the mechanics of this application.  Though Martin and Jimmie Lee Brown are in accord on the preclusive scope of the Phase I findings (and therefore this Court will fashion appropriate implementing jury instructions), those cases diverge on the question of how to properly instruct a jury on the issues of class membership and legal causation.  The question is an important one because plaintiffs' burden of proving causation is one of the primary procedural safeguards erected by the Florida Supreme Court in Engle III.  See Engle III, 945 So. 2d at 1263 ("In Phase I, the jury decided issues related to Tobacco's conduct but did not consider whether any class

55

members relied on Tobacco's misrepresentations or were injured by Tobacco's conduct.")

In <u>Martin</u>, the trial court instructed the jury that to establish Mr. Martin's entitlement to the Phase I approved findings, it needed to find that he was addicted to cigarettes and that smoking cigarettes containing nicotine caused his death. However, the court did not thereafter require the jury to make a separate finding that any of Defendants' *conduct*, as alleged in the underlying claims, was the legal cause of Mr. Martin's death. The practical result of <u>Martin</u>'s approach is that a progeny plaintiff need only prove that addiction to cigarettes caused his injury, and is thereafter alleviated from establishing that Defendants' conduct was also a legal cause of that injury. <u>See</u> <u>Jimmie Lee Brown</u>, 70 So. 3d at 714 ("We read <u>Martin</u> to approve the use of the class membership instruction for the dual purpose of satisfying the element of legal causation with respect to addiction and legal causation on the underlying . . . claims.")

Conversely, the trial court in <u>Jimmie Lee Brown</u>, utilizing a two-phase trial, bifurcated this causation inquiry. In the first phase, "the jury was asked to determine whether Mr. Brown was a member of the <u>Engle</u> class, i.e. whether he was addicted to RJR cigarettes containing nicotine; and, if so, was his addiction a legal cause of his death." <u>Id.</u> In the second phase, "the jury was to determine (i) whether RJR's conduct was a legal cause of Mr. Brown's death; (ii) comparative fault; and (iii) damages." <u>Id.</u> at 713. The Fourth DCA, in approving the trial court's approach, disavowed <u>Martin</u> to the extent that the First DCA appeared to "equat[e] the legal causation instruction used on the issue of addiction with a finding of legal causation on the plaintiff's strict liability and negligence claims." <u>Id.</u> at 716. As the Fourth DCA explained:

56

> Legal causation on the issue of addiction is separate and apart from legal causation on the strict liability and negligence claims in this instance. Post-Engle plaintiffs do not satisfy their burden of proving legal causation in a strict liability or negligence claim by merely establishing class membership in the first phase of trial. To satisfy this requirement, a jury must be asked to determine (i) whether the defendant's failure to exercise reasonable care was a legal cause of decedent's death; and (ii) whether the defective and unreasonably dangerous cigarettes were a legal cause of decedent's death. In the present case, the trial court correctly required the jury to make these critical determinations. . . .
>
> It is at this point that we depart from the First District's decision in Martin, because there specific instructions on legal causation on the negligence and strict liability claims were not given to the jury. Martin, 53 So.3d at 1064–66.

Id. at 715-16.

This Court is of the opinion that the bifurcated causation inquiry endorsed by the Fourth DCA in Jimmie Lee Brown is the better way to proceed because it requires a specific causal link between Defendants' conduct and a progeny plaintiff's injuries and damages. That said, the Court does not go quite so far as to require that class membership be determined in an entirely separate trial phase, as the trial court did in Jimmie Lee Brown. Rather, the Court intends to conduct one trial and instruct the jury as to all issues—including class membership and legal causation regarding the underlying claims—and thereafter utilize a special verdict form. The special verdict form, which will be explained to the jury during jury instruction, will first ask the jury to make findings as to the class membership questions (i.e., addiction and addiction causation). Should the jury find the progeny plaintiff to be an Engle class member, it will then make specific findings as to whether Defendants' conduct was a legal cause of injury for each claim asserted. After these causation questions have been answered by the jury, they will (if necessary) proceed to address the question of comparative fault. This construct will provide more specificity on the causation question, while remaining

57

true to the Florida Supreme Court's directive in Engle III.

## IV.    Conclusion

This Court must determine whether Engle III, Martin, and Jimmie Lee Brown combine to deny Defendants their constitutional due process rights.  Defendants had full notice and opportunity to be heard in the year-long trial of Phase I of the Engle case.  Special jury findings that individually addressed each Defendant's conduct went against the Defendants. The Florida Supreme Court's decision in Engle III (as implemented by Martin and Jimmie Lee Brown) to give those Phase I findings "res judicata" effect for future cases was a constitutionally permissible application of Florida issue preclusion law in these *sui generis* cases.[46]  "We must bear in mind that no single model of procedural fairness, let alone a particular form of procedure, is dictated by the Due Process Clause.  The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation."    Kremer, 456 U.S. at 483 (citations and quotations omitted). Defendants' due process rights are not being violated.

Accordingly, it is hereby

**ORDERED**:

Defendants' Motion To Determine the Preclusive Effect of the Engle Phase I Findings Under Rule 16(c) (Doc. 35) is **GRANTED** to the extent that the Court has determined the

---

[46]    Though the Defendants have asserted a Seventh Amendment argument in other contexts of the Engle progeny litigation, they have not done so here.

preclusive effect of the Engle Phase I findings, and will proceed as stated in this Order.[47]

**DONE AND ORDERED** at Jacksonville, Florida, this 20th day of December, 2011.

TIMOTHY J. CORRIGAN
United States District Judge

jmm.

Copies:
Counsel of Record

---

[47] In their Joinder in RJR's Rule 16(c) Motion, Liggett and Vector contend that this Court should deny preclusive effect of the Phase I findings as to them, for differing reasons. (See Doc. 36.) However, plaintiffs did not meaningfully respond to Liggett or Vector's arguments in their responses or at the September 7 hearing. Furthermore, as Liggett and Vector are not parties in this case, the Court declines to address the issue here—it is more appropriately addressed by dispositive motion in one of the activated cases in which Liggett and Vector are named as defendants.